Commonwealth *v.* Thomas, Appellant.

Argued May 6, 1971. Before BELL, C. J., EAGEN, O'BRIEN, ROBERTS, POMEROY and BARBIERI, JJ.

438

*Edward Rosenwald* and *Leonard Levin,* for appellant.

*James T. Ranney,* Assistant District Attorney, with him *Milton M. Stein,* Assistant District Attorney, *James D. Crawford,* Deputy District Attorney, *Richard A. Sprague,* First Assistant District Attorney, and *Arlen Specter,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE EAGEN, October 12, 1971:

This is an appeal from the judgment of sentence imposed upon the appellant, Lawyer Thomas, following his conviction of murder in the second degree by a judge sitting without a jury.

Five principal errors are alleged to have occurred during the trial proceedings below which assertedly either require an arrest of judgment or a new trial. After studying the assignments of error with the trial record, we are convinced the judgment should be affirmed.

It is first urged that the trial court erred in refusing to sustain a demurrer to the Commonwealth's trial evidence because of inconsistencies and discrepancies therein, or, alternatively, because it was insufficient as a matter of law to establish Thomas' guilt beyond a reasonable doubt. This contention is clearly without merit.

The prosecution emanated from the fatal shooting of one George Gorrell in Philadelphia. Three eyewitnesses testified that Thomas and George Whitfield strode up to a group of teenage boys standing on a street corner; that without immediate provocation Thomas punched one of the boys, Gorrell, with his fist and as the latter fell backward, Thomas drew a revolver and shot him in the head. This evidence amply meets the test to be applied in determining the sufficiency of the evidence to sustain a criminal conviction, which test we have repeatedly enunciated. For example, see *Commonwealth v. Williams*, 443 Pa. 85, 277 A. 2d 781 (1971).

While there were some discrepancies in the testimony of the witnesses who testified for the Commonwealth, they were not as grave as appellant would have us believe and certainly do not compel a finding of reasonable doubt as a matter of law.

For instance, one of the eight Commonwealth witnesses testified she "thought" she heard two noises that sounded like firecrackers, whereas the remainder of the witnesses heard but one single shot.

There was also a discrepancy between the weight of the specimen bullet removed from the decedent's head (37¼ grains) and the 40-grain bullets seized by the police in the Thomas residence. However, while positive identification of the specimen bullet was impossible due to its mangled condition, an expert testified that the sheared and flattened bullet extracted from decedent's head would be consistent with being a .22 "long rifle" bullet such as those found in the Thomas house.

Likewise, there was some inconsistency among the witnesses as to how many others were with Thomas as he approached the Gorrell group. Some thought there were two, while others said there was only one, namely, Whitfield. Those who testified that Thomas was ac-

companied by two additional persons were unable to describe the third person. Most importantly, however, all eyewitnesses described and identified Thomas as the one who shot Gorrell. We note also that Whitfield, whose testimony was introduced by the defense,[1] stated Thomas did the shooting. Further, Thomas did not take the stand to deny it.

Under the circumstances, the discrepancies complained of went to the credibility of the Commonwealth's witnesses, and this question was for the trier of the facts.

It is also complained that the trial court erred in permitting, over objection, the trial testimony of three witnesses identifying Thomas as the killer, because their in-court identification was based on a prior identification on the night of the crime conducted at police headquarters under impermissible constitutional standards.

At the pretrial "Wade" hearing, the court barred testimonial reference to the in-custody identification by these witnesses,[2] but ruled their testimony should not be precluded at trial if the Commonwealth could first establish by clear and convincing evidence that their identification of Thomas was based on observations other than those made during the police show-up. The trial judge then held that it had been demonstrated to the satisfaction of the court that the witnesses involved had sufficient opportunity at the time of the shooting to scrutinize the person who shot Gorrell and their identification of Thomas originated from this incident and not from the identification at the police station. Two of the witnesses were standing with Gor-

---

[1] While admitting Thomas shot Gorrell, Whitfield testified this occurred only after Gorrell had attacked Thomas.

[2] This ruling was based on the court's conclusion that there had been a violation of *United States v. Wade*, 388 U.S. 218, 87 S. Ct. 1926 (1967).

rell and only a few feet distant from the assailant at the moment the fatal shot was fired. The third such witness was only 10 feet away. They testified the lighting was good at the time and nothing existed to impair their vision. They were also able to describe the assailant with substantial accuracy. Further, despite rigorous cross-examination their unequivocal in-court identification of Thomas never wavered. Under such circumstances, the challenged testimony was properly admitted at trial. See *Gilbert v. California*, 388 U.S. 263, 87 S. Ct. 1951 (1967), and *Commonwealth v. Whiting*, 439 Pa. 205, 266 A. 2d 738 (1970).

It is next argued that the weight of the evidence established Thomas was legally insane at the time the crime was committed, and hence the court below erred in at least not awarding a new trial.

The psychiatric trial testimony on this issue was extensive. Defense psychologists testified that Thomas' I.Q. (he scored 61 on an intelligence test administered to him in 1965) put him at the retarded level; that he was in constant trouble in school and that he was placed in retarded educable classes in school never rising above accomplishing third-grade-level work.

The defense psychiatrist, Dr. Richard Lonsdorf, testified that in his opinion defendant was mentally ill; that part of his mental illness was his inability to control his aggressive tendencies. On cross-examination the doctor said that abstracting the appellant from the situation in which he found himself, he would know right from wrong concerning the shooting of another person. But in the context of the concrete situation with its accompanying stress "in a sense of how he feels and how he responds" he would not so distinguish. Dr. Lonsdorf also testified that an encephalogram test showed defendant to have some brain disfunction but in answer to the district attorney's questions explained that the brain disfunction in and of itself is not mental

disorder or mental illness, but is a background on which other things can develop.

Dr. Fred Herring who had examined Thomas to determine his competency to stand trial testified on the issue of appellant's sanity for the Commonwealth. He based his conclusions on the same school psychological reports used by Dr. Lonsdorf, plus his competency interview with Thomas and the results of tests administered at that time by a court psychologist.

In Dr. Herring's estimation, Thomas was a paranoid personality and a borderline mental retardate. But the psychiatrist stated that it was also his opinion that appellant knew right from wrong when he shot Gorrell, regardless of whether the decedent had struck him first or not. On cross-examination, Dr. Herring conceded that sufficient stress could cause a breakdown in an individual so that he would not know right from wrong "but there also would be a lot of evidence to show he had broken down in a lot of other areas."

Assuming arguendo, that the testimony of the psychiatrist-witness called by the defense was sufficient to establish Thomas was not culpable because of insanity (but see Commonwealth v. Updegrove, 413 Pa. 599, 198 A. 2d 534 (1964); Commonwealth v. Woodhouse, 401 Pa. 242, 164 A. 2d 98 (1960); and Commonwealth v. Neill, 362 Pa. 507, 67 A. 2d 276 (1949)), this testimony must be weighed with the psychiatric testimony offered by the Commonwealth. And when so considered it became a matter of credibility for the trier of the facts to resolve. While the sufficiency of the evidence is for the court, the weight thereof is a matter exclusively for the fact finder. See Commonwealth v. Updegrove, supra; Commonwealth v. Woodhouse, supra; Commonwealth v. Lance, 381 Pa. 293, 113 A. 2d 290 (1955), and Commonwealth v. Pasco, 332 Pa. 439, 2 A. 2d 736 (1938). Under the circumstances, we find no error of law or abuse of discretion on the part of

the trial court in accepting the evidence offered by the Commonwealth and rejecting the defense of insanity.[3]

Alternatively, counsel for appellant ask us to apply the doctrine of homicidal mania to this case.[4]

Assuming again that homicidal mania is still a viable legal principle in Pennsylvania (but see *Commonwealth v. Woodhouse,* supra; and *Commonwealth v. Neill,* supra), the proof failed to satisfactorily estab-

[3] It cannot be denied that Thomas is a most unfortunate youngster of low intelligence with mental and emotional problems which by consensus of both experts, require treatment. However, "the fact that a person who commits murder or any felony is a low grade or high grade moron or a mental defective is not a legal excuse or legal justification for crime nor for a commensurate punishment and sentence." *Commonwealth ex rel. Rivers v. Myers,* 414 Pa. 439, 443, 200 A. 2d 303 (1964), cert. denied 379 U.S. 866, 85 S. Ct. 135.

[4] This doctrine was first articulated in the case of *Commonwealth v. Mosler,* 4 Pa. 264, 267 (1846), where it was observed: "[T]here is a *moral* or *homicidal* insanity, consisting of an irresistible inclination to kill, or to commit some other particular offence. There may be an unseen ligament pressing on the mind, drawing it to consequences which it sees, but cannot avoid, and placing it under a coercion, which, while its results are clearly perceived, is incapable of resistance. The doctrine which acknowledges this mania is dangerous in its relations, and can be recognized only in the clearest cases. It ought to be shown to have been habitual, or at least to have evinced itself in more than a single instance. It is seldom directed against a particular individual; but that it may be so, is proved by the case of the young woman who was deluded by an irresistible impulse to destroy her child, though aware of the heinous nature of the act. The frequency of this constitutional malady is fortunately small, and it is better to confine it within the strictest limits. If juries were to allow it as a general motive, operating in cases of this character, its recognition would destroy social order as well as personal safety. To establish it as a justification in any particular case, it is necessary either to show, by clear proofs, its contemporaneous existence evinced by present circumstances, or the existence of an habitual tendency developed in previous cases, becoming in itself a second nature."

lish such a mania in this case. The sole evidence tendered consisted of testimony in the form of school reports which showed that Thomas was a belligerent, disruptive youngster who fought with and abused other children; was disrespectful towards his teachers; had carried a knife to school on one occasion, and in 1959 had "playfully attempted to choke several of his classmates." Such proof in the aggregate does not establish the presence of an irresistible inclination to kill which had become "in itself a second nature".

It is also argued that the admission into evidence of the results of the psychological testing by the court psychologist was hearsay, and that the Commonwealth psychiatrist's opinion based in part on such hearsay constituted such prejudicial error as to require a new trial.[5]

The trial judge was most liberal in allowing into evidence reports which defense experts and the Commonwealth's psychiatrist used as background for their findings and opinions.[6]

---

[5] In essence what had happened was that at the time of the competency examination by Dr. Herring, as part of that process, the appellant was also tested by the court psychologist, a Mr. Middleton, who was not called to testify at trial. On the witness stand, Dr. Herring was asked and gave the scores of these various tests. It was also clear that in reaching the opinion that Thomas was not insane at the time of the killing, Dr. Herring was able to use as background his own interview with appellant, the court psychologist's tests, and all the reports of numerous psychological tests and interviews which had been done by the Child Study Center at the behest of school authorities. This latter material was also used by the defense psychiatrist in forming his opinion of insanity.

[6] E.g., the defense was allowed over objection to have psychologist Feigenberg testify about his testing of appellant and conclusions therefrom which were based in part on incident reports of aggressive and hostile acts and background information furnished by school authorities. The court ruled that such reports were admissible, not as to their truth, but simply as to what the psychologist had in the way of background information. He used the

In Pennsylvania, our cases have heretofore ruled that an expert may not state a conclusion which is based on evidence not in the record. See *Murray v. Siegal*, 413 Pa. 23, 195 A. 2d 790 (1963), and cases cited therein. However, several jurisdictions influenced by the teaching of highly regarded legal commentators have recognized an exception to this rule and have permitted medical witnesses to express opinion testimony on medical matters based, in part, upon reports of others which are not in evidence, but which the expert customarily relies upon in the practice of his profession. See *Brown v. United States*, 375 F. 2d 310 (1967); *Jenkins v. United States*, 307 F. 2d 637 (U.S.C.A. D.C. Cir. 1962); *Taylor v. Monongahela Ry.*, 155 F. Supp. 601 (D.C. W.D. Pa. 1957), affirmed per curiam, 256 F. 2d 751 (3d Cir. 1958); *Sundquist v. Madison Ry.*, 197 Wis. 83, 221 N.W. 392 (1928); *Schooler v. State*, 175 S.W. 2d 664 (Tex. Civ. App. (1943); and *Gray v. Bird*, 380 S.W. 2d 908 (Tex. Civ. App. 1964). See also 3 Wigmore, Evidence §688 (3d ed. 1940); McCormick, Evidence §15 (1954).

As Professor Wigmore explains, "where the information is that of an attending nurse or physician having personal observations and an interest in learning and describing accurately, there seems to be every reason for admitting testimony based in part on this." 3 Wigmore, Evidence §688(4) (Chadbourn Revision).

It appears to us that the foregoing limited exception is wise and salutary, hence we adopt it as the law in Pennsylvania.

Moreover, assuming that the admissibility of the challenged hearsay testimony was error, and the testimony of the Commonwealth's psychiatrist, Dr. Herring, was tainted in some degree thereby, we do not

---

same reasoning to allow in the court psychologist's reports presently in issue.

consider the error of such significance as to warrant a new trial.

Dr. Herring forthrightly testified that his opinion was that Thomas was sane at the time of the killing and knew right from wrong. To arrive at this conclusion, he relied on his own interview with the appellant, plus a study of all the psychological tests which had been done on Thomas, including those by the school psychologists, as well as that of Middleton. Nothing contained in any of these reports made him think otherwise. It is therefore reasonable to infer that if he were allowed to testify only on the basis of his own observations, plus a study of the school psychologists' reports he would still aver that his opinion was that Thomas, at the crucial moment when he fired the gun, knew right from wrong.

Errors in ruling on evidentiary matters do not require reversal if the accused's rights have not been prejudiced. 10A P.L.E. Criminal Law §959. See *Commonwealth v. Eckhart*, 436 Pa. 361, 260 A. 2d 750 (1970).

The final assignment of error asserts that articles seized in the Thomas residence (a gun, bullets and a bloody shirt) and used as evidence against him at trial were the fruits of an unconstitutional search. The court below following an evidentiary hearing ruled otherwise, and we conclude correctly so.

The search was made pursuant to a warrant issued on a complaint which recited probable cause in compliance with the standards recited in *Aguilar v. Texas*, 378 U.S. 108, 84 S. Ct. 1509 (1964).[7] But it is argued

---

[7] The recitation of probable cause read as follows: "On Friday, August 11th, 1967, at 11:30 p.m., one George Gorrell, 18 and colored, was shot and killed on the highway 51st and Cedar Avenue with a small caliber weapon. George Whitfield, 17 and colored, of 1317 S. Melville Street, stated that Lawyer Thomas was in possession of a .22 caliber firearm at 51st and Cedar Avenue on

that information included therein resulted from police questioning of Thomas violative of *Miranda v. Arizona,* 384 U.S. 436, 86 S. Ct. 1602 (1966).

Accepting only for the purposes of this opinion, that Thomas was questioned by the police in the absence of *Miranda* warnings when such warnings should have been given, and hence, any information gained from Detective Scott personally may not be considered in determining if probable cause existed, the warrant was still not illegally issued. The complaint also included information gained by the police from Whitfield, an eyewitness, and this, in itself, was sufficient probable cause. "[T]he law is quite clear that the inclusion of illegally obtained evidence does not vitiate a search warrant which is otherwise validly issued upon probable cause reflected in the affidavit and based on proper sources. Clay v. United States, 246 F. 2d 298 (5th Cir. 1957), cert. denied, 355 U.S. 863, 78 S. Ct. 96, 2 L. Ed. 269; Chin Kay v. United States, 311 F. 2d 317 (9th Cir. 1963)": *United States v. Sterling,* 369 F. 2d 799, 802 (3d Cir. 1966). Accord, *James v. United States,* 418 F. 2d 1150 (1969).

Judgment affirmed.

Mr. Justice JONES took no part in the consideration or decision of this case.

Friday, August 11th, 1967, at approximately 11:25 p.m. Thomas states that his uncle Joseph Thomas owns such a firearm. Whitfield also states that Thomas was seen with blood on a brown shirt."