390 A.2d 172

COMMONWEALTH of Pennsylvania

v.

William DANIELS, Appellant.

Supreme Court of Pennsylvania.

Argued Jan. 17, 1977.

Decided July 27, 1978.

William C. Costopoulos, Lemoyne, Richard D. Ballou, Honesdale, for appellant.

Nicholas A. Barna, Dist. Atty., Stephen G. Bresset, Honesdale, for appellee.

Before EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION

POMEROY, Justice.

Appellant William Daniels, charged with murder in connection with the death of Jonathan D. Smith,[1] was tried before a jury in the Court of Common Pleas of Wayne County. The jury returned a verdict of guilty of voluntary manslaughter. Following the denial of post-trial motions and the entry of judgment of sentence, a direct appeal was brought here.[2] We will affirm.

A summary of the evidence upon which the jury could properly have based its verdict, see, e. g., *Commonwealth v. Hubbard,* 472 Pa. 259, 266, 372 A.2d 687 (1977); *Commonwealth v. Rose,* 463 Pa. 264, 267–68, 344 A.2d 824 (1975), is necessary to an understanding of appellant's claims. The record discloses that in 1967 Jonathan Smith, 21 years of age, was a resident at the Hillcrest School, a privately operated boarding school for retarded children and juveniles

1. Since Smith's death occurred in 1967, the prosecution was brought under Section 701 of the 1939 Penal Code, Act of June 24, 1939, P.L. 872, *as amended,* 18 P.S. § 4701 (1963), replaced by Section 2502 of the 1972 Crimes Code, *as amended,* 18 Pa.C.S. § 2502 (Supp.1978).

2. Appellate Court Jurisdiction Act, Act of July 31, 1970, P.L. 673, No. 223, art. II, § 202(1), 17 P.S. § 211.202(1) (Supp.1978).

near Hawley, Pennsylvania. William Daniels was employed at the school as a night attendant. According to the testimony of numerous former residents at the school, Smith was a target of a pattern of physical abuse either directed by or performed by Daniels. Smith was beaten from time to time, either by Daniels or by others acting at his direction, and once suffered a broken arm as a consequence. On at least one occasion Smith was tied in a spread-eagle fashion to his bed. He was deprived of food. He was put out of the school's dormitory while partially clothed or naked, and exposed to the cold for varying lengths of time. One distinctive form of abuse was "the drink," in which Smith was placed in a bathtub and forcibly held under water and deprived of air for a period of time.

Repeated abuses of this sort continued until Smith's death on the morning of May 19, 1967. Dr. Hobart Owens, the school's physician, testified that Smith had been suffering from influenza pneumonia for some ten days prior to his death; other witnesses testified that he had been ill for some two weeks. During this period, Smith was running a high temperature; other symptoms included coughing, abnormal sweating, shaking and lethargy. Despite this illness, appellant ordered Smith on the night before his death to "run wetters," [3] a form of punishment. Some time later, Norman Murray and James Sipes, two residents of the school, were ordered by appellant to take Smith from the dormitory and throw him naked over a nearby embankment. The school was located on high ground and witnesses testified that the weather at the time was cold, with snow on the ground. Smith was out of doors for a period from one-half hour to an hour. When he was allowed to return to the building, he was shivering noticeably and asked for medical attention. Instead, Daniels ordered him to resume "running wetters." One witness testified that Smith was subjected to "the drink" on the same night; another testified that the

3. This task required Smith to awaken other residents who suffered from incontinence and to take them to the bathroom as a preventive measure.

last such incident was one or two nights before Smith's death.

Several hours after these events, Smith went to the bathroom, asked for a drink of water, collapsed and died. Appellant, who had told Smith ". . . you better not die on my shift," had already left the premises, leaving Murray in charge until the day shift arrived. On Smith's death certificate Dr. Owens stated the cause of death to be a pulmonary embolism. Smith's body, being unclaimed, was sent to Temple University Medical School in Philadelphia on the day of his death, and was eventually cremated. No autopsy was ever performed.

The Commonwealth's chief medical witness was Dr. Halbert Fillinger, a forensic pathologist. He testified that in his opinion the cause of Smith's death was bronchial pneumonia, which was the result of the following "multiple contributing factors:" "the dehydration, the physical abuse which has weakened this deceased . . . a prior ongoing infection . . . weakening him, making him more susceptible to the effects of abuse both physical and climatologic, and the accelerating process of pneumonia causing his death." Dr. Fillinger further testified that, assuming the truth of the events described by the former residents, "[t]he circumstances described . . . both in times several days to several weeks prior to his demise and specifically on the night of his death, indicate clearly—particularly those circumstances that occurred shortly before his death—a series of episodes which accelerated his diseased process and brought about his death," and that Smith's exposure to the cold on the night before he died "had a marked accelerating effect upon his demise." The Commonwealth produced another medical witness, Dr. Marvin Aranson, who also qualified as an expert in forensic pathology. It was Dr. Aranson's opinion that the cause of Smith's death was "a pneumonia due to the exposure to the water ["the drink"], the exposure to the cold temperatures, and aggravated by the other factors of beatings and starvation." He also testified that, in his opinion, "[t]he non-medical treatment of beat-

ings, starvation and exposure would be that which made an otherwise healthy 23-year old or 22-year old die from this disease, which healthy people in this age group do not usually die from."

## I.

Appellant's challenge to the sufficiency of the evidence is not directed to the proof of malice,[4] but rather to the medical evidence of causation. This argument is in two parts, neither of which we can accept. As to the first part, which is that the Commonwealth's proof impermissibly deviated from the allegations of the indictment, see *Commonwealth v. Pope,* 455 Pa. 384, 391, 317 A.2d 889 (1974), the record shows that this issue was not raised before the court below on post-verdict motions; it is therefore waived. *Commonwealth v. Santiago,* 476 Pa. 340, 382 A.2d 1200 (1978); *Commonwealth v. Carr,* 471 Pa. 86, 369 A.2d 1207 (1977); *Commonwealth v. Bronaugh,* 459 Pa. 634, 331 A.2d 171 (1975). Compare *Commonwealth v. Williams,* 476 Pa. 557, 570–571, 383 A.2d 503, 509–10 (1978). The second part of the argument, which is that Dr. Fillinger's testimony was insufficient to warrant the jury's conclusion that death occurred by means of a criminal agency, is similarly misplaced, for it ignores the clearly sufficient evidence given by Dr. Aranson.[5]

---

**4.** See *Commonwealth v. Boyd,* 461 Pa. 17, 24–25, 334 A.2d 610 (1975); *Commonwealth v. Coleman,* 455 Pa. 508, 318 A.2d 716 (1974); *Commonwealth v. Lawrence,* 428 Pa. 188, 236 A.2d 768 (1968); *Commonwealth v. Cheeks,* 423 Pa. 67, 73–74, 223 A.2d 291 (1966); *Commonwealth v. Malone,* 354 Pa. 180, 47 A.2d 445 (1946). See also *Commonwealth v. Kramer,* 474 Pa. 341, 345, 378 A.2d 824, 826 (1977); *Commonwealth v. Hoffman,* 439 Pa. 348, 356–59, 266 A.2d 726 (1970).

**5.** The argument, which relies upon *Commonwealth v. Radford,* 428 Pa. 279, 236 A.2d 802 (1968), and *Commonwealth v. Embry,* 441 Pa. 183, 282 A.2d 178 (1971), is without merit in any event. See *Commonwealth v. Williams, supra,* 476 Pa. at 566, 383 A.2d at 507–08 (1978); *Commonwealth v. Ilgenfritz,* 466 Pa. 345, 349–52, 353 A.2d 387 (1976); *Commonwealth v. Webb,* 449 Pa. 490, 296 A.2d 734 (1972). We also note that Dr. Fillinger testified that his opinion was fixed "beyond a reasonable doubt," and that Dr. Aranson stated that

## II.

■ We next consider appellant's argument that Dr. Fillinger was permitted to base his opinion on hearsay and that reversible error was thereby committed.

Dr. Fillinger testified that he had conducted an investigation into the death of Jonathan Smith. His testimony showed that he had made use of the following sources in arriving at his opinion: interviews with former residents of the school (all of whom testified for the Commonwealth concerning Smith's symptoms); certain hospital records (Commonwealth's Exhibit # 9, the hematology and serology reports); the death certificate (Commonwealth's Exhibit # 8); a letter from and a conversation with a person who had performed a dissection of a body believed to be that of the deceased;[6] the testimony the doctor had heard during the trial; and certain police reports concerning Smith's death. Dr. Fillinger was asked whether, as a result of this investigation, he had come to an opinion regarding the cause and manner of Smith's death. He answered in the affirmative and, over objection, was permitted to testify to that opinion. The doctor later testified in answer to a hypothetical question that assuming the testimony of the Commonwealth's witnesses to be true, the incidents of physical and other abuse set forth by those witnesses "indicate clearly" a direct causal relationship between the abuse and Smith's death. No objection was made to this hypothetical question.

Appellant largely relies on cases holding that an expert should not be permitted to express an opinion in response to a hypothetical question which is based on assumed facts not of record or warranted by the evidence. See, e. g., *Commonwealth v. Paskings*, 447 Pa. 350, 355, 290 A.2d 82 (1972);

"[m]y opinions are made with at least reasonable medical certainty, and in that context I have answered these questions with the same degree of certainty in my own mind as I am certain that there will be a sunrise tomorrow, whether I am here to see it or not."

**6.** See note 10, *infra*. The dissection was performed by a Dr. Joel Rauchwuenger at Temple University. It was done not by way of conducting an autopsy but as part of a project in experimental human anatomy at the University.

*Murray v. Siegal,* 413 Pa. 23, 29–30, 195 A.2d 790 (1963). But no such objection was made, or indeed could properly be made, to the hypothetical question asked of Dr. Fillinger in this case, which was grounded exclusively on the testimony of witnesses who had already been heard. See, *e. g., Abbott v. Steel City Piping Co.,* 437 Pa. 412, 421–22, 263 A.2d 881 (1970); *Battistone v. Benedetti,* 385 Pa. 163, 169–70, 122 A.2d 536 (1956); *Hampton v. S. S. Kresge Co.,* 224 Pa.Super. 543, 551–52, 307 A.2d 366 (1973). Thus the objection that the medical evidence was inadmissible because based on hearsay must necessarily be viewed as directed to the bases, which are recited above, for Dr. Fillinger's opinion on the cause and manner of Smith's death.

What we said in *Reardon v. Meehan,* 424 Pa. 460, 465–66, 227 A.2d 667, 670–71 (1967), is pertinent here:

"The employment of testimony of an expert rises from necessity, a necessity born of the fact that the subject matter of the inquiry is one involving special skills and training beyond the ken of the ordinary layman: [citations omitted.] . . . The qualifications of this witness and the competency of his testimony, to a considerable extent, were matters within the discretion of the court below. See: *Cooper v. Metropolitan Life Ins. Co.,* 323 Pa. 295, 301, 186 A. 125 (1936); *Stevenson v. East Deer Township,* 379 Pa. 103, 106, 108 A. 815 (1954)."

Accord: *Laubach v. Haigh,* 433 Pa. 487, 491, 252 A.2d 682, 683 (1969); *Commonwealth v. Nasuti,* 385 Pa. 436, 443, 123 A.2d 435, 438 (1956) ("Expert testimony is admissible in all cases, civil and criminal alike, when it involves explanations and inferences not within the range of ordinary training, knowledge, intelligence and experience."). In addition, it should be observed that all expert opinion is based on "hearsay" to some extent. As the Fifth Circuit has noted:

"[T]he opinion[s] of expert witnesses must invariably rest, at least in part, upon sources that can never be proven in court. An expert's opinion is derived not only from records and data, but from education and a lifetime of experience. Thus, when the expert witness has consulted

numerous sources, and uses that information, together with his own professional knowledge and experience, to arrive at his opinion, that opinion is regarded as evidence in its own right and not as hearsay in disguise." *United States v. Williams,* 447 F.2d 1285, 1290 (5th Cir. 1971) (en banc), *cert. denied,* 405 U.S. 594, 92 S.Ct. 1168, 31 L.Ed.2d 231 (1972).

*Accord:* McCormick, Evidence § 15, at 36 (2d ed. E. Cleary et al. 1972); II Wigmore, Evidence § 665(b) (3d ed. 1940). With these precepts in mind, we examine the bases for the doctor's opinion.

An autopsy, which of course would have been desirable as a basis for Dr. Fillinger's opinion, was impossible since the body had long since been cremated. Although a post-mortem examination was not a *sine qua non* in the circumstances of this case, a description of the symptoms the deceased exhibited about the time of his death was critical, and necessarily had to come from those persons who were near him at the time. Here, that description came from former residents at the school.

Professor Rheingold noted some years ago:

"[I]nformation relayed to [a physician] has never been as acceptable to the courts . . . as information gained firsthand or even general background knowledge. Its secondhandedness immediately raises the flag of hearsay with its attendant banners of fear of inaccurate perception and fear of lack of sincerity of the declarant or one observed. While the application of these restrictive requirements must be considered separately for each type of secondary information, the observation must be that generally the rules are too restrictive, and, taken literally, could only have the cumulative effect of preventing just determination of disputed cases." Rheingold, The Basis of Medical Testimony, 15 Vand.L.Rev. 473, 493 (1962).

McCormick, *supra,* at 35, has noted a "strong trend" in recent cases towards permitting an expert medical witness to base his opinion on reports by others on which the expert customarily relies in the practice of his profession, including,

in part, observations of behavior and symptoms by lay persons. Our own decisions have been part of this trend. See *Commonwealth v. Thomas*, 444 Pa. 436, 444–45, 282 A.2d 693, 698 (1971); *Jumper v. Jumper*, 240 Pa.Super. 99, 102–03, 362 A.2d 411 (1976). See also, *e. g.*, *People v. Stone*, 35 N.Y.2d 69, 315 N.E.2d 787, 358 N.Y.S.2d 737 (1974). *See generally* Rheingold, *supra*, at 503–04; Comment, The Admissibility of Expert Testimony Based in Part upon Information Received from Third Persons, 35 So.Cal.L.Rev. 193 (1962); III Wigmore, Evidence §§ 688–89 (Chadbourn rev. 1970).[7] In the circumstances of this case we believe that the

7. In *Commonwealth v. Thomas, supra,* we stated:

   "In Pennsylvania, our cases have heretofore ruled that an expert may not state a conclusion which is based on evidence not in the record. See *Murray v. Siegal,* 413 Pa. 23, 195 A.2d 790 (1963), and cases cited therein. However, several jurisdictions influenced by the teaching of highly regarded legal commentators have recognized an exception to this rule and have permitted medical witnesses to express opinion testimony on medical matters based, in part, upon reports of others which are not in evidence, but which the expert customarily relies upon in the practice of his profession. See *Brown v. United States,* 126 U.S.App.D.C. 134, 375 F.2d 310 (1967); *Jenkins v. United States,* 113 U.S.App.D.C. 300, 307 F.2d 637 (1962); *Taylor v. Monongahela Ry.,* 155 F.Supp. 601 (D.C.W.D. Pa.1957), affirmed per curiam, 256 F.2d 751 (3d Cir. 1958); *Sundquist v. Madison Ry.,* 197 Wis. 83, 221 N.W. 392 (1928); *Schooler v. State,* 175 S.W.2d 664 (Tex.Civ.App.1943); and *Gray v. Bird,* 380 S.W.2d 908 (Tex.Civ.App.1964). See also 3 Wigmore, Evidence § 688 (3d ed. 1940); McCormick, Evidence § 15 (1954)."

   \* \* \* \* \* \*

   "It appears to us that the foregoing limited exception is wise and salutary, hence we adopt it as the law in Pennsylvania." 444 Pa. at 445, 282 A.2d at 698–99.

   We cannot accept appellant's contention that the rule in *Thomas* is necessarily limited to observations of other persons within the medical profession. Wigmore himself rejected this argument:

   "It should be immaterial whether the informant is a professional person or is the wife or other member of the household so long as the information is based on attendance and personal observation. The rulings have thus far not always accepted this view, and the language of some of the opinions may well seem to a physician a pedantic enforcement of legal nicety inconsistent with the needs of practical life." III Wigmore, Evidence § 688, at 10–11 (Chadbourn rev. 1970).

   Indeed, in *Thomas* the trial judge permitted expert opinions "based in part on incident reports of aggressive and hostile acts and background information furnished by school authorities. The court ruled that such reports were admissible, not as to their truth, but simply as

trial court was plainly correct in allowing the doctor's opinion to be partly so based. The symptoms described in the interviews were fully disclosed to the jury during the doctor's testimony, and all the persons who were interviewed by the doctor took the stand at trial.[8] Thus the jury was fully informed of this part of the basis for Dr. Fillinger's opinion and could intelligently assess the medical testimony in light of the lay testimony at trial. Compare *United States v. Sims,* 514 F.2d 147, 149 (9th Cir.), *cert. denied,* 423 U.S. 845, 95 S.Ct. 83, 46 L.Ed.2d 66 (1975); *United States v. Williams, supra; People v. Sugden,* 35 N.Y.2d 453, 323 N.E.2d 169, 363 N.Y.S.2d 923 (1974).[9]

Dr. Rauchwuenger did not take the stand, but the propriety of the use of Dr. Fillinger's consultation with him is also controlled by *Commonwealth v. Thomas, supra.* Our opinion in that case noted that " 'where the information is that of an

to what the psychologist had in the way of background information." 444 Pa. at 444 n.6, 282 A.2d at 698 n.6. See also *Jumper v. Jumper, supra; People v. Stone, supra;* Fed.R.Evid. 703, and Advisory Committee's Note thereto.

**8.** It is true that one of those interviewed, George Saunders, did not testify during the Commonwealth's case in chief, and appeared only on rebuttal. Cases in the Superior Court have recognized, however, that a hypothetical question may properly be asked on the basis of assumed facts which later become a part of the record. *Lebesco v. Southeastern Pennsylvania Transportation Auth.,* 251 Pa.Super. 415, 418, 380 A.2d 848, 850 (1977); *Baltimore & O.R.R. v. Langenfelder & Son, Inc.,* 222 Pa.Super. 138, 140–44, 292 A.2d 415 (1963). We think that the reasoning of these cases applies with equal force to the case at bar.

**9.** In *Commonwealth v. Paskings,* 447 Pa. 350, *supra,* 447 Pa. at 355–56, 290 A.2d at 85, this Court stated: "As with all expert opinion . . . it is essential that the salient facts relied upon as the basis for the opinion be in the record." Our opinion today is entirely in accord with *Paskings.* In that case, an expert's opinion as to the origin of a fire was excluded when it was shown that the basis of his opinion was reading the notes of testimony of a previous trial and a view of the exterior of the burned structure some six years after the event. Since the jury was entirely ignorant of the basis afforded by the notes of testimony, which were not read into the record, it could not make any informed evaluation of the expert's opinion, which was thus of no aid to the trier of fact. In the instant case, however, the "salient facts" were in the record, and the jury was fully capable of evaluating the opinion.

attending nurse or physician having personal observation and an interest in learning and describing accurately, there seems to be every reason for admitting testimony based in part on this.' " 444 Pa. at 445, 282 A.2d at 699, *quoting* III Wigmore, *supra,* § 688, at 10. Such an interest was manifestly present in the minute dissection performed as part of Dr. Rauchwuenger's anatomy study. Again, the findings of the examination were fully disclosed and available for the jury in weighing Dr. Fillinger's opinion.[10] Similarly immune from attack are the hospital records and the death certificate, which had already been admitted in evidence.[11] We conclude that none of the objections to Dr. Fillinger's testimony, whether taken singly or collectively, has merit.

## III.

Appellant next contends that when Dr. Fillinger testified that, in his opinion, the manner of Smith's death was "homicide," he usurped the function of the jury by expressing an opinion on an ultimate issue, and that this

**10.** Appellant repeats here one of his principal contentions at trial, *viz.,* that the body examined by Dr. Rauchwuenger was not that of Jonathan Smith. The argument is based on the fact that during the course of his testimony Dr. Fillinger stated at one point that the dissection was performed in June, 1970. The appellant countered this statement with evidence tending to show that Smith's corpse was cremated in February, 1969. But the doctor made two other references to the time of the dissection in his testimony, and both times stated that the dissection was a continuing process begun in June, 1967. Thus the question of whether the body examined was actually that of Jonathan Smith was one for the jury to resolve in deciding the weight to be accorded the doctor's opinion, and the jury was so instructed by the trial judge. It should also be noted that Dr. Fillinger testified that the findings of Dr. Rauchwuenger did not contribute to Fillinger's conclusion that the cause of Smith's death was bronchial pneumonia, but rather showed that the dissection revealed no evidence to support a diagnosis of pulmonary embolism, which had been the opinion of the school doctor, Dr. Owens.

**11.** The trial record shows extensive reliance by Dr. Fillinger on the hematology and serology reports, which he described as "very significant." No such reliance on the police reports, which were concerned primarily with statements of former residents of the school, is indicated, and we cannot say that these reports significantly influenced the doctor's opinion. See *Commonwealth v. Boykin,* 450 Pa. 25, 29–30, 298 A.2d 258 (1972) (plurality opinion).

constituted reversible error. This argument is devoid of merit. As applied to the expression of an expert's opinion, the phrase "usurping the function of the jury" is, as Dean Wigmore has well said, normally "a mere bit of empty rhetoric." VII Wigmore, Evidence § 1920, at 17 (3d ed. 1940). ". . . [T]he witness, in expressing his opinion, is not attempting to usurp the jury's function; nor could he if he desired. . . . He could not usurp it if he would, because the jury may still reject his opinion and accept some other view . . ." *Id.* at 21. The contention that an expert should never be permitted to express an opinion on an "ultimate issue" is similarly misconceived. "[E]ven when the very point in issue is to be spoken to, the jury should have help if it is needed." *Id.* § 1921, at 18. Pennsylvania cases, which recognize that the central inquiry is whether the proffered opinion will be helpful to the trier of fact in reaching a decision, are in accord. *Reardon v. Meehan, supra,* 424 Pa. at 464–66, 227 A.2d at 670–71; *Auerbach v. Philadelphia Transportation Co.,* 421 Pa. 594, 604–05, 221 A.2d 163, 170–71 (1966); *Commonwealth v. Nasuti, supra,* 385 Pa. at 443, 123 A.2d at 438; *Cooper v. Metropolitan Life Ins. Co.,* 323 Pa. 295, 186 A. 125 (1936). Compare *Taylor v. Fardink,* 231 Pa.Super. 259, 331 A.2d 797 (1974). *See also* Fed.R.Evid. 704, and Advisory Committee's Note thereto;[12] Model Code of Evidence § 904.

"Undoubtedly there is a kind of statement by the witness which amounts to no more than an expression of his general belief as to how the case should be decided. . . . There is no necessity for this kind of evidence; . . . it is wholly without value to the trier of fact in reaching a decision." McCormick, *supra,* § 12, at 26–27. Such a situation does not exist in this case. The question of the cause of Jonathan Smith's death, involving as it did "explanations and inferences not within the range of ordinary training,

12. Rule 704 of the Federal Rules of Evidence provides:
    "Opinion on Ultimate Issue
    "Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."

knowledge, intelligence and experience," *Commonwealth v. Nasuti, supra,* was clearly a proper subject for expert testimony. The word "homicide," as the trial judge pointed out to the jury at the conclusion of the doctor's testimony, is a neutral term. The ultimate issue in this case—whether Daniels was legally responsible for Smith's death—was in no way decided for the jury (as indeed it could not be) by the doctor's use of a shorthand term that was fully elucidated both by his testimony and by the trial judge's instructions.

## IV.

We consider, lastly, appellant's claim that the delay between Jonathan Smith's death and appellant's arrest constituted a deprivation of due process of law. The record shows that Smith died on May 19, 1967, and that appellant was arrested on January 28, 1974, some six and three-quarter years later. Because of this lapse of time appellant brought an application to dismiss the indictment pursuant to Pa.R.Crim.P. 316,[13] which was denied by the trial court.

On this record, we believe that the trial court's denial of the motion to dismiss was correct. At the outset, we note that appellant's claim is not directed toward a denial of his Sixth Amendment right to a speedy trial after arrest. See, e. g., *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972); *Commonwealth v. Hamilton,* 449 Pa. 297, 297 A.2d 127 (1972). *See also* Pa.R.Crim.P. 1100. Rather, this claim is concerned with a deprivation of due process of law under the Fourteenth Amendment by reason of a delay between the commission of an alleged criminal offense and the accusation of the defendant by means of complaint

---

**13.** Effective January 1, 1978, Rule 316 was renumbered as Rule 315, with no substantive alteration. The rule provides as follows:

"(a) Upon application and a showing that an information has not been filed within a reasonable time or that an indictment has not been found against a defendant within a reasonable time, the court may order dismissal of the prosecution, or in lieu thereof, make such other order as shall be appropriate in the interests of justice.

"(b) The attorney for the Commonwealth shall be afforded opportunity to show cause why the relief prayed for should not be granted."

or indictment. This distinction was made clear in *United States v. Marion,* 404 U.S. 307, 313–21, 92 S.Ct. 455, 459–463, 30 L.Ed.2d 468, 474–79 (1971). The *Marion* Court further noted that statutes of limitation do not provide the sole protection for one who complains of delay prior to formal accusation, and that "the Due Process Clause . . . would require dismissal of the indictment if it were shown at trial that the pre-indictment delay in this case caused substantial prejudice to [defendants'] rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused." 404 U.S. at 324, 92 S.Ct. at 465, 30 L.Ed.2d at 481 (citations and footnote omitted). Such considerations are particularly apposite in murder prosecutions, where no statute of limitations is applicable. Crimes Code § 108(a), *as amended,* 18 Pa.C.S. § 108(a) (Supp.1978); Act of March 31, 1860, P.L. 427, § 77, *as amended,* 19 P.S. § 211 (1964).

*Marion* was further elucidated in *United States v. Lovasco,* 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977). In that case, the defendant was able to demonstrate that two witnesses assertedly material to his defense had died during a preindictment delay. The Court, however, rejected his claim "that due process bars prosecution whenever a defendant suffers prejudice as a result of preindictment delay." 431 U.S. at 789, 97 S.Ct. at 2048, 52 L.Ed.2d at 758–59. Instead, it held that an inquiry into the prosecution's reasons for the delay is not required until a claim of prejudice to the accused is made out.

> "[*Marion*] establishes only that proof of actual prejudice makes a due process claim concrete and ripe for adjudication, not that it makes the claim automatically valid. . .
>
> *Marion* makes clear that proof of prejudice is generally a necessary but not sufficient element of a due process claim . . . " *Id.,* 431 U.S. at 789, 97 S.Ct. at 2048, 52 L.Ed.2d at 759.

Cf. *Commonwealth v. Crawford,* 468 Pa. 565, 568–70, 364 A.2d 660 (1976). The Court then accepted the Government's representation that the investigative delay in the case before

it was caused "by the Government's efforts to identify persons in addition to [the defendant] who may have participated in the offenses," and concluded that "compelling [Lovasco] to stand trial would not be fundamentally unfair." *Id.,* 431 U.S. at 796, 97 S.Ct. at 2052, 52 L.Ed.2d at 763.[14]

Appellant's argument here is largely directed to his assertion that there was sufficient evidence in the hands of the Wayne County Coroner in 1971 and the Pennsylvania State Police in 1972 to justify appellant's arrest. But the passage of time since these dates does not, without more, provide a basis for accepting appellant's due process claim.

> "There is no constitutional right to be arrested. The police are not required to guess at their peril the precise moment at which they have probable cause to arrest a suspect, risking a violation of the Fourth Amendment if they act too soon, and a violation of the Sixth Amendment if they wait too long. Law enforcement officers are under no duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause, a quantum of evidence which may fall far short of the amount necessary to support a criminal con-

14. The Court explained its standard of review as follows:
    "[T]he Due Process Clause does not permit courts to abort criminal prosecutions simply because they disagree with a prosecutor's judgment as to when to seek an indictment. Judges are not free, in defining 'due process,' to impose on law enforcement officials our 'personal and private notions' of fairness and to 'disregard the limits that bind judges in their judicial function.' *Rochin v. California,* 342 U.S. 165, 170, 72 S.Ct. 205, 96 L.Ed. 183, 25 A.L.R.2d 1396 (1952). Our task is more circumscribed. We are to determine only whether the action complained of—here, compelling respondent to stand trial after the Government delayed indictment to investigate further—violates those 'fundamental conceptions of justice which lie at the base of our civil and political institutions,' *Mooney v. Holohan,* 294 U.S. 103, 112, 55 S.Ct. 340, 79 L.Ed. 791, 98 A.L.R. 406 (1935), and which define 'the community's sense of fair play and decency,' *Rochin v. California,* supra, at 173, 72 S.Ct. 205, 96 L.Ed. 183, 25 A.L.R.2d 1396. See also *Ham v. South Carolina,* 409 U.S. 524, 526, 93 S.Ct. 848, 35 L.Ed.2d 46, (1973); *Lisenba v. California,* 314 U.S. 219, 236, 62 S.Ct. 280, 86 L.Ed. 166, (1941); *Hebert v. Louisiana,* 272 U.S. 312, 316, 47 S.Ct. 103, 71 L.Ed. 270, 48 A.L.R. 1102 (1926); *Hurtado v. California,* 110 U.S. 516, 535, 4 S.Ct. 111, 28 L.Ed. 232 (1884)." *Id.* at 790, 97 S.Ct. at 2049, 52 L.Ed.2d at 759.

viction." *Hoffa v. United States,* 385 U.S. 293, 310, 87 S.Ct. 408, 417, 17 L.Ed.2d 374, 386 (1966), *quoted in Marion, supra,* 404 U.S. at 325 n. 18, 92 S.Ct. at 465 n. 18, 30 L.Ed.2d at 481 n. 18, and *Lovasco, supra,* 431 U.S. at 792 n. 13, 97 S.Ct. at 2050, 52 L.Ed.2d at 760 n. 13.

And, as the Court in *Lovasco* further explained, there is no such "right to prosecution" even when sufficient evidence has been adduced to prove guilt beyond a reasonable doubt. Such a right "would pressure prosecutors into resolving doubtful cases in favor of early—and possibly unwarranted —prosecutions," and would "preclude the Government from giving full consideration to the desirability of not prosecuting in particular cases." 431 U.S. at 794, 97 S.Ct. at 2051, 52 L.Ed.2d at 761. We decline to adopt a contrary rule, even assuming that there was sufficient evidence to warrant prosecution at the times asserted by appellant.

Appellant also contends that the Commonwealth has not advanced sufficient justification for the delay in investigation. We may agree that the record as to the causes of the delay is not as full as one might wish.[15] But we believe that appellant's claim must fail because he has shown no actual prejudice resulting from the investigative delay that "makes a due process claim concrete and ripe for adjudication." *Lovasco, supra,* 431 U.S. at 789, 97 S.Ct. at 2048, 52 L.Ed.2d at 759. See also *United States v. Juarez,* 561 F.2d 65, 67–70 (7th Cir. 1977); *United States v. King,* 560 F.2d 122, 129–31

15. The record does indicate that the investigation of Jonathan Smith's death was a long and complex one. According to Trooper Robert Bernathy, the State Police inquiry into numerous suspicious deaths at the Hillcrest School began in October 1972, and over 100 former residents, who by this time were widely dispersed, were interviewed. Adding to the difficulties were the residents' mental retardation and the absence of the deceased's body. The record also discloses that appellant had no prior criminal record. Compare *United States v. Lovasco, supra,* 431 U.S. at 795, 97 S.Ct. at 2051, 52 L.Ed.2d at 762.

We are also informed by the trial judge's opinion that there was an effort on the part of the former management of the school to hinder the investigations into the various deaths. The record sheds no light, however, on the nature of the obstruction or how it might have affected the instant case.

(2d Cir.), *cert. denied,* 434 U.S. 925, 98 S.Ct. 404, 54 L.Ed.2d 283 (1977). Unlike *Lovasco,* there is no showing that material witnesses were lost to the defense before appellant's arrest. It is argued that either insanity or alibi defenses might have been available to appellant had his arrest come sooner, but these assertions are no more than speculation. Indeed, appellant's own testimony established his regular employment on the night shift at the school and his presence there on the night before Smith's death, and the identification testimony relative to Daniels was substantial and unequivocal.[16] Loss of memory is also alleged by Daniels, but this claim also is undermined by his trial testimony. That testimony dealt in detail with Daniels' activities at the school generally and on the night of Smith's death in particular. Much more substantial claims of impaired memory have been rejected by other courts. See, *e. g., United States v. Juarez, supra,* 561 F.2d at 68–69, and cases cited therein; *United States v. Finklestein,* 526 F.2d 517, 526 (2d Cir. 1975), *cert. denied sub nom. Scardino v. United States,* 425 U.S. 960, 96 S.Ct. 1742, 48 L.Ed.2d 205 (1976). Finally, there is not a scintilla of support in the record for any assertion that the pre-arrest delay in this case "was an intentional device to gain tactical advantage over the accused." *United States v. Marion, supra,* 404 U.S. at 324, 92 S.Ct. at 465, 30 L.Ed.2d at 481 (footnote omitted). See also *United States v. Lovasco, supra,* 431 U.S. at 795 & n. 17, 97 S.Ct. 2051 n. 17, 52 L.Ed.2d at 762 & n. 17. Under these circumstances, we

**16.** We cannot accept appellant's reliance on *Commonwealth v. DeRose,* 225 Pa.Super. 8, 307 A.2d 425 (1973), partly for this reason, for that case rested on "an uncorroborated identification by one witness," 225 Pa.Super. at 13, 307 A.2d at 428, to an event the exact date of which the witness was unable to establish. No such situation is present in this case. Moreover, *DeRose* was based on *Ross v. United States,* 121 U.S.App.D.C. 233, 349 F.2d 210 (1965), and its progeny, which the United States Supreme Court in *Marion, supra,* characterized as "a unique line of cases . . . concerning pre-indictment delay in narcotics cases where the Government relies on secret informers and (frequently) on single transactions. These cases . . . are based on the Court of Appeals' purported supervisory jurisdiction . . ." 404 U.S. at 317 n. 5, 92 S.Ct. at 461 n. 8, 30 L.Ed.2d at 477 n. 8.

cannot say that the delay in arrest here worked any violation of due process upon appellant.

The judgment of sentence is affirmed.

ROBERTS and MANDERINO, JJ., concur in the result.

JONES, former C. J., did not participate in the consideration or decision of this case.