631 A.2d 1289

Kimberly JONES

v.

George N. CONSTANTINO, M.D., and Gregory Vincent, M.D.

**Appeal of George N. CONSTANTINO, M.D.**

Superior Court of Pennsylvania.

Argued May 27, 1993.

Filed July 28, 1993.

Reargument Denied Oct. 6, 1993.

74

Francis J. McGovern, Plymouth Meeting, for appellant.

Karen L. Saraco, Langhorne, for appellee.

Before ROWLEY, President Judge, and CAVANAUGH and FORD ELLIOTT, JJ.

CAVANAUGH, Judge:

This is an appeal from an order which granted appellee Kimberly Jones' request for judgment notwithstanding the verdict. The order also granted in the alternative, if the above verdict is set aside on appeal, that the appellee be awarded a new trial. Our review concludes that judgment notwithstanding the verdict was improperly granted. However, we affirm the lower court's award of a new trial. Order affirmed in part, and reversed in part.

This case arises from a medical malpractice claim brought by the appellee, Kimberly Jones, for injuries she sustained in a gallbladder operation performed by appellant George Constantino, M.D., and co-defendant Gregory Vincent, M.D. In March, 1987, the appellee was under the care of Dr. Vincent, who diagnosed her as having chronic cholecytitis. Because the appellee experienced recurrent attacks of upper right quadrant and epigastric abdominal pain, nausea, and vomiting, she decided in consultation with Dr. Vincent to have an elective gallbladder operation on April 3, 1987 at St. Mary's Hospital in Bucks County. Dr. Vincent was scheduled to perform the surgery, apparently with the appellant, Constantino, assisting him. However, immediately before the time scheduled for surgery, the appellee's parents [1] were informed by the appellant that Dr. Vincent was delayed because of an emergency case in another hospital. It was agreed that the appellant would begin without Dr. Vincent.[2] Before the arrival of Constantino's partner, an unplanned injury occurred.

The injury occurred to the appellee's common hepatic duct. Testimony indicated that the ducts of the gallbladder and the liver transport bile, which is a toxin that helps break down food, to the large intestines. The left hepatic duct and the right hepatic duct emerge from two sides of the liver, and

1. Appellee was 17 years old at the time of surgery.
2. Testimony differs as to whether the appellant offered to start "prepping" the appellee for surgery or whether he offered to actually start the operation without his partner. As resolution of this disparity in the testimony does not impact on any issue before us, we simply note the differing positions in passing.

merge near the gallbladder beneath the liver to form the common hepatic duct. The common hepatic duct then merges with another bile duct from the gallbladder, the cystic duct, to form the common bile duct. During the operation, the common hepatic duct somehow became severed. Both sides agree that the common hepatic duct is relatively far away (over an inch and a half) from the operative site, and that severing the duct was neither necessitated nor anticipated as part of the operation.

As a result of the injury, the operation turned from an hour-and-a-half procedure to an over four-and-a-half hour procedure. Dr. Vincent, absent when the injury occurred, assisted the appellant in repairing the damage. To repair the injury, the appellant bifurcated the right and left hepatic ducts with a rubber t-tube stenting, attaching the two hepatic ducts into the duodenum (the first division of the small intestine). One limb of the t-tube subsequently became dislodged before appellee left the hospital on April 12, 1987. On May 19, 1987, the first tube was removed by the appellant; the second tube was removed on June 1, 1987 by Dr. Vincent. After the operation, Dr. Vincent and the appellant informed the appellee's parents that an unexpected injury occurred during surgery.

Subsequent to the removal of these tubes, the appellee had numerous symptoms of someone whose bile has backed up because the hepatic ducts had narrowed or closed by stricture (scarring), which is not an unusual reaction when these small ducts are attached to a portion of the bowel. Namely, appellee started vomiting, having back pain, contracted a high fever, and suffered extreme itching. After numerous visits to her family physician and Dr. Vincent, she underwent an operation at Jefferson Hospital to correct this problem. The operation was unsuccessful and her condition continued to get worse. She was readmitted to Saint Mary's on September 19, 1987, with a basic diagnosis of stricture of both hepatic ducts. It was considered necessary to transfer her to Hahnemann Hospital, where an operation was performed which inserted wires and catheters to dilate the strictures and drain her of

78

bile. These tubes led to bags that were attached to the appellee's legs. These tubes were not removed until six months after discharge. Because of the concern that these tubes could be easily dislodged, the appellee and her family were forced to undergo serious dislocations in their life style.

This suit was filed on March 8, 1989, alleging that the appellant and Dr. Vincent were negligent in the removal of the gallbladder. The trial was conducted by jury on February 19, 1992, and lasted five days. At the close of her case-in-chief, the appellee agreed to the entry of non-suit as to defendant Gregory Vincent, M.D. A motion by George Constantino, M.D., for non-suit was refused. At the conclusion of the trial, the jury granted a verdict in favor of the appellant. The lower court issued an order granting the appellee's subsequent motion for judgment n.o.v. The court's order alternatively granted the appellee a new trial. As the court's rationales for its rulings help to shed light on our disposition, we recount them at some length.

The court opined that judgment not withstanding the verdict was appropriate because the appellant admitted that, in a gallbladder operation, there is no reason to cut or injure the common hepatic duct. The court further found that the appellant at least tacitly admitted to cutting the duct. He noted that his post-operative report, dictated minutes after surgery, indicated that the duct had been "inadvertently transected." During cross-examination, appellant claimed that when he wrote "inadvertently transected," he was not admitting he transected or cut the duct. Rather, he was merely noting that somehow the duct became separated during the operation. Upon further cross, however, the appellant acknowledged that he was the only person with a knife or scissors and he must have been the one to "cut" the common hepatic duct. The court added that the plaintiff's expert consistent with this "admission" stated that there was no reason to "cut" the common hepatic duct.

The court ruled that if our Court decides to reverse his grant of judgment notwithstanding the verdict, a new trial would be held on three independent bases.

The court first of all felt that it erroneously permitted the appellant's expert, a Dr. Hughes, to testify beyond the fair scope of his report. The doctor's report claimed in a general way that the accident did not happen through any negligence, and did not supply a specific theory as to why the accident happened. At trial, however, Dr. Hughes testified that the accident was likely caused by "traction," which is the normal manipulation of tissue, organs, and other objects during an operation. Dr. Hughes claimed also that the operative area was very delicate, and that an injury could happen to the common hepatic duct without cutting.

The court also ruled, secondly, that it erroneously refused to issue an "increased risk of harm" jury instruction to the jury. The court presently believes that the evidence could be construed to indicate that the defendant failed to take certain precautions during surgery, thereby increasing the appellee's chance of injury. These precautions included: (1) failing to identify all vascular and ductal structures relating to the gall bladder prior to approaching the operative site with scissors; (2) failure to perform a careful anatomical dissection prior to the division of any structure of the biliary tree; and (3) failure to perform a cholangiogram prior to the division of any structure of the biliary tree.

The court finally ordered a new trial because it was in error to permit, over objection, Dr. Hughes to read a paper entitled "Early Management of Operative Injuries of the Extrahepatic Biliary Tract." It noted that Pennsylvania law does not permit experts to read portions of learned treatises to juries on direct examination. *See Majdic v. Cincinnati Mach. Co.*, 370 Pa.Super. 611, 537 A.2d 334 (1988) (*en banc*) and *Kearns by Kearns v. DeHaas*, 377 Pa.Super. 200, 546 A.2d 1226 (1988).

It is from this order granting judgment notwithstanding the verdict, and, in the alternative, a new trial, that this appeal arises.

Appellant raises four issues on appeal: (1) whether the appellee was entitled to judgment n.o.v. given the facts adduced at trial; (2) whether the grant of a new trial was

warranted on the basis that appellant's expert witness testified beyond the fair scope of his expert report subjecting the appellee to unfair surprise; (3) whether a new trial is warranted on the basis that appellant's expert witness read a portion of a paper given at a medical conference to the jury for the truth of the matters contained therein; (4) whether the grant of a new trial was warranted based on the court's refusal to charge on the increased risk of harm doctrine. We address these issues seriatim.

Appellant's first argument is that the lower court committed an error of law in granting the appellee's motion for judgment notwithstanding the verdict. The appellant claims that the lower court mischaracterized his testimony as an admission that he had "cut" the hepatic duct with surgical scissors during the operation. He asserts that the lower court ignored the thrust of his testimony and Dr. Hughes' testimony that the probable cause of the accident was "traction," the normal manipulation of tissue, vessels, and other objects during surgery.

The appellee counters that the entry of judgment, notwithstanding the verdict, was entirely appropriate. He cites to various parts of the transcript where appellant and Dr. Hughes appear to concede that appellant "cut" the common hepatic duct. He notes that the appellant in his post-operative report states he "inadvertently transected" the duct.

■ An appellate court reviews an order granting or denying judgment n.o.v. under the following standard:

> The standard which we employ when reviewing the denial of a motion of directed verdict and a motion for judgment n.o.v. is the same. We will reverse the lower court when we find an abuse of discretion or an error of law that controlled the outcome of the case.

*Timbrook v. Foremost Insurance Co.*, 324 Pa.Super. 384, 387, 471 A.2d 891, 892 (1984), *citing McDevitt v. Terminal Warehouse Co.*, 304 Pa.Super. 438, 442, 450 A.2d 991, 993 (1982).

■ There is ample law describing when it is appropriate for a trial court to grant a motion for judgment n.o.v. Such a

motion will only be granted in a clear case where no two reasonable minds could fail to agree that the verdict is improper. *Lira v. Albert Einstein Medical Center,* 384 Pa.Super. 503, 508, 559 A.2d 550, 552 (1989), *alloc. den.,* 527 Pa. 635, 592 A.2d 1302 (1990). "[T]he evidence must be considered in the light most favorable to the verdict winner, and he must be given the benefit of every reasonable inference of fact arising therefrom, and any conflict in the evidence must be resolved in his favor." *Moure v. Raeuchle,* 529 Pa. 394, 402, 604 A.2d 1003, 1007 (1992), *quoting Broxie v. Household Finance Company,* 472 Pa. 373, 380, 372 A.2d 741, 745 (1977). It is further well-settled that a judge should not reach his decision on how he would have voted if a member of the jury, but on the facts as they present themselves through the sieve of the jury's deliberations. *Moure, supra,* 529 Pa. at 402, 604 A.2d at 1007; *Brown v. Shirks Motor Express,* 393 Pa. 367, 375, 143 A.2d 374, 379 (1958).

Our reading of the record before us indicates that this is not a clear case and reasonable minds could disagree as to the import of the evidence. The court supports its analysis by referring to isolated portions of the Notes of Testimony, but ignores their totality. Although sometimes their use of language was imprecise,[3] both the appellant and his expert witness testified that the duct was not separated with a scissors or knife, but was most likely separated by normal traction or manipulation. The only vessel that Dr. Constantino testified as cutting was an artery, which was a necessary part of the operative procedure he was performing. He stated that he carefully visualized the clamping of that artery and "felt" it as he cut it. Dr. Constantino repeatedly testified that he could not have cut the duct with scissors because he only cut the artery and he got nowhere near the common hepatic duct before he noticed the injury. He explained that he used the word "transected" in his report not as a synonym for the word "cut," but as a medical term of art to describe the nature of the injury as a separation across the vessel as opposed to a

---

**3.** The appellant and his expert used the word "cut" as a synonym for the word "tear" or the word "separate."

longitudinal or partial division. Notwithstanding, the court mischaracterizes his testimony as an admission he "cut" the duct with his surgical scissors during the operation.

The tenor of the trial court's opinion is to give these two words the effect of an admission of legal responsibility. However, we believe that the evidence could be reasonably construed to admit of more than one meaning. *See, e.g., Dible v. Vagley,* 417 Pa.Super. 302, 612 A.2d 493, 499 (1992) (subject statements were ambiguous and insufficient to compose judicial admissions). By far the better reading of the testimony adduced at trial is that the appellant did not admit to "cutting" the common hepatic duct, and that both he and Dr. Hughes believed the injury occurred because of "traction." Considering the evidence in the light most favorable to the verdict winner, and giving him the benefit of all inferences, we believe that it is apparent that reasonable minds could disagree as to the accident's cause. The court abused its discretion in granting a judgment notwithstanding the verdict.

■ The appellant's second, third, and fourth arguments all concern the court's alternative ruling that a new trial is mandated by trial errors. The standard of review of a trial court's grant of a motion for a new trial is whether the court palpably and clearly abused its discretion or committed an error of law. *Coker v. S.M. Flickinger Co., Inc.,* 533 Pa. 441, 445, 625 A.2d 1181, 1183 (1993); *Westinghouse Elevator Co. v. Herron,* 514 Pa. 252, 256, 523 A.2d 723, 725 (1987).

The appellant's second argument is that the lower court clearly abused its discretion in ordering a new trial because Dr. Hughes' trial testimony was not within the fair scope of his expert report. He claims that the Discovery Rules pertaining to the disclosure of an expert witness are meant to afford only enough discovery to prevent tactical surprise. *See Neal v. Lu,* 365 Pa.Super. 464, 530 A.2d 103 (1987). He believes that the expert report sufficiently apprised the appellee of Dr. Hughes' planned testimony when it revealed that it was his opinion that it was "not negligence" when the duct "somehow divided." The appellant asserts that Dr. Hughes

merely fleshed out his expert report when he testified, supplying reasons why he thought the injury occurred without negligence. The appellant alternatively argues that the appellee suffered no prejudice from a lack of clarity, as the appellee learned a year before trial from Dr. Constantino's deposition that "traction" was one possible explanation for the injury.

■ We believe that Dr. Hughes' testimony was certainly not within the letter or spirit of Pa.R.Civ.P. 4003.5. Rule 4003.4 "favors the liberal discovery of expert witnesses and disfavors unfair and prejudicial surprise." *Augustine v. Delgado,* 332 Pa.Super. 194, 199, 481 A.2d 319, 321 (1984). Relevant to this appeal, Pa.R.Civ.P. 4003.5(c) states as follows:

(c) To the extent that the facts known or opinions held by an expert have been developed in discovery proceedings under subdivision (a)(1) or (2) of this rule, his direct testimony at the trial may not be inconsistent with or go beyond the fair scope of his testimony in the discovery proceedings as set forth in his deposition, answer to an interrogatory, separate report, or supplement thereto. However, he shall not be prevented from testifying as to facts or opinions on matters on which he has not been interrogated in the discovery proceedings.

The Explanatory Note to Rule 4003.5 states in pertinent part as follows:

To prevent incomplete or "fudging" of reports which would fail to reveal fully the facts and opinions of the expert or his grounds therefor, subdivision (c) provides that an expert's direct testimony at trial may not be inconsistent with or go beyond the fair scope of his testimony as set forth in his deposition and answer to interrogatories, separate report or supplements thereto. However, he may testify to anything which he has never questioned in the discovery proceedings. This is a new provision not expressly found in the Federal Rule. It is implicit in the Federal Rule.

■ We have recently held as follows:

[I]n deciding whether an expert's trial testimony is within the fair scope of his report, the accent is on the word "fair".

The question to be answered is whether, under the particular facts and circumstances of the case, the discrepancy between the expert's pre-trial report and his trial testimony is of a nature which would prevent the adversary from preparing a meaningful response, or which would mislead the adversary as to the nature of the response.

*Dibel v. Vagley,* 417 Pa.Super. 302, 315, 612 A.2d 493, 499 (1992), *quoting Wilkes–Barre Iron v. Pargas of Wilkes–Barre,* 348 Pa.Super. 285, 290, 502 A.2d 210, 212–3 (1985). We have found that the above limitations on the scope of the expert's testimony "serves to insure that an expert's report will be sufficiently comprehensive and detailed to inform an opposing party of the expert's testimony at trial." *Havasy v. Resnick,* 415 Pa.Super. 480, 489, 609 A.2d 1326, 1331 (1992); *accord Pargas, supra,* 348 Pa.Super. at 290, 502 A.2d at 212. The tenor of our prior precedent requires prejudice to the opposing party before an opinion given outside the scope of an expert report is considered reversible error. *Butler v. Kiwi, S.A.,* 412 Pa.Super. 591, 603, 604 A.2d 270, 276 (1992); *Delgado, supra,* 332 Pa.Super. at 200–5, 481 A.2d at 322–4. Given the above pronouncements, it is clear that the expert's testimony violated Rule 4003.5.

The appellant sent to the appellee two versions of the separate expert report, an initial version and an updated one. Both expert reports provide only conclusory statements and general, unsupported opinions in describing why the accident occurred without negligence. The initial expert report provides that "[d]uring the procedure, the gallbladder was actually removed, the hepatic duct was *somehow* inadvertently divided." (emphasis added) The report regarding the injury's occurrence is elsewhere no more enlightening. Dr. Hughes asserts later in the report simply:

Inadvertent damage to the ductal system happens in the best of hands to experienced surgeons sooner or later if they do enough gall bladder surgery, and it is not due to negligence.

In the updated expert report, Dr. Hughes was equally imprecise in providing a theory as to how the accident occurred

without negligence. He opined simply that "[t]he injury suffered by this unfortunate patient was unavoidable and was promptly discovered by Dr. Constantino and corrected in an accepted manner."

■ At trial, however, Dr. Hughes went beyond his simple assertions of non-negligence. He provided an in-depth theory of how the accident occurred without negligence. Dr. Hughes claimed that the accident occurred because of "traction," an injury caused by the normal manipulation of extremely fragile ducts in the course of the surgery:

Dr. Hughes:

My opinion is that traction that is necessary—

Attorney:

Again, I object. This is outside the scope of the reports that were submitted. There was nothing discussed about traction in the physician's reports.

(SRK)

\* \* \* \* \* \*

Attorney:

Doctor, you were talking about traction.

(KHW)

Dr. Hughes:

Once a surgeon enters the abdominal cavity, he makes the incision. He looks down and sees the organs that can be moved out of the way—which must be moved out of the way before he can get down to where the gall-bladder is to see what he is doing.

Now, in the process of doing that as the doctor mentioned earlier with you, you put in retractors. You put them on top of the colon. That is up here and the retractors are about this long and this wide.

The usual type that it used is curved like this. You put that in there and it instantly pulls that down.

Now, the liver is hanging over this area. So this has to be put up here and a retractor put in and has to be lifted up this way and that puts these tissues on stretch.

And it is my opinion these injuries at this level are not caused by cutting. You can't hardly do it. I've done thousands of them and when a surgeon is up there cutting—he is down here cutting and the cystic artery is no where up there.

The only thing that makes sense to me in this case is the simple part of it. You heard the doctor say, you heard the testimony, when he saw the duct up there, he used the word cellophane—it looked like cellophane. It was so thin and fragile. We know their [sic] tiny from the operative cholangiogram. That three millimeters in diameter is down here, up here may be smaller.

So, it is my opinion that is how this injury happened.

While the appellant may think that Rule 4003.5 allows his expert to make a bald assertion of non-negligence in his expert report and then proffer an in-depth theory explaining absence of culpability at trial, we simply disagree.

We specifically reject appellant's misconception that the discovery rules relating to expert witnesses are meant to afford only enough discovery to prevent tactical surprise. As noted *supra*, Rule 4003.5 "favors the liberal discovery of expert witnesses and disfavors unfair and prejudicial surprise." To accept appellant's position we would be sanctioning ambiguity and avoidance in separate reports. We do not think that a pre-trial separate report of an expert is in comport with Rule 4003.5 where it fails to apprise the opposing party of the basis for the expert's ultimate conclusion. *Cf. Havasy, supra,* 415 Pa.Super. at 492, 609 A.2d at 1332.

A much closer question is whether the appellee was prejudiced or surprised by the appellant's testimony. Appellant argues with some force that the appellant's deposition testimony, taken a year before trial, informed his opponent that the "traction" defense could be used. He refers us to two brief snippets of testimony in the appellant's deposition that the injury may have occurred because of the fragility of the ducts and the retraction done during the surgery to gain access to the gallbladder. The clearest snippet is as follows:

Q. How are you postulating the tear occurred?

A. I think two ways it could have occurred. One is with a retractor. As we separate, pull up on the liver and pull down on the bowel, that puts pressure and the retractor itself could have injured the ducts, possibly just the tension on the duct could have torn it.

Appellant states that the appellant's testimony in this regard was sufficient to inform the appellee that "traction" might be used as a defense at trial. He cites for support *Boyce v. St. Paul Property and Liability*, 421 Pa.Super. 582, 618 A.2d 962 (1992).

We do not think the brief, oblique references in the *appellant's* deposition testimony sufficiently put the appellee on notice that *appellant's expert* would testify that "traction" was the cause of the injury. The appellant did not refer to the "traction" theory by name. His deposition testimony on the subject was brief. The testimony did not inform the appellee what was the basis for the *expert's* opinion. We believe the better argument is that the appellee was prejudiced. We note that in *Boyce, supra,* the court found no surprise existed when *the expert who made the report* testified in two depositions pertaining to matter that was arguably beyond the scope of the expert report. *Id.* at 593, 618 A.2d at 968. We do not believe that the lower court palpably and clearly abused its discretion in ordering a new trial on this basis.

The appellant's third argument is that the lower court abused its discretion in granting a new trial on the basis that it erroneously allowed Dr. Hughes to read to the jury portions of a "learned treatise" during direct examination. Appellant claims that contrary to the appellee's assertion, neither the medical article or the "test results" reported in the article were admitted into evidence. The appellant, in fact, asserts that the contents of the article were not read to the jury. Rather, Dr. Hughes merely "observed" that the location of the nineteen (19) injuries reported in the article supported his opinion. The appellant further claims that this testimony was admissible because medical experts are allowed to express

opinions based in part on medical reports, which though not in evidence, are customarily relied on by experts in the practice of the profession. He relies principally in this regard on *Primavera v. Celotex Corp.*, 415 Pa.Super. 41, 608 A.2d 515 (1992). The appellant attempts to distinguish in a footnote on its facts *Majdic v. Cincinnati Machine Co.*, 370 Pa.Super. 611, 537 A.2d 334, 340 (1988) (*en banc*), which the lower court found dispositive.

We agree with the lower court that *Majdic, supra,* correctly summarizes the law relating to learned treatises in Pennsylvania and is dispositive. In *Majdic,* we re-examined *en banc* the rule which prohibits hearsay statements appearing in learned treatises from being admitted into evidence and used as substantive proof of the information which they discuss. The plaintiff in that case attempted to show through the expert testimony of a mechanical engineer that a power press manufactured by the defendant was defective because of the absence of safety guards. During the expert's testimony, the plaintiff sought to introduce into evidence various articles in trade publications and learned treatises upon which the expert relied in forming an opinion. The plaintiff also requested to read excerpts from the articles aloud at trial. We found that the trial court's decision to refuse plaintiff's requests was in accordance with the law. We summarized the law on learned treatises as follows:

The law in this Commonwealth is well-settled that an expert witness may be cross-examined on the contents of a publication upon which he or she has relied in forming an opinion, and also with respect to any other publication which the expert acknowledged to be a standard work in the field. *See: Cummings v. Borough of Nazareth*, 430 Pa. 255, 242 A.2d 460 (1968); *Walheim v. Kirkpatrick*, 305 Pa.Super. 590, 451 A.2d 1033 (1982); and, *Brannan v. Lankenau Hospital*, [254 Pa.Super.] 352, [365,] 385 A.2d 1376 (1978), *rev'd. on other grounds*, 490 Pa. 588, 417 A.2d 196 (1980). In such cases, the publication or literature is not admitted for the truth of the matter asserted, but only to challenge the credibility of the witness' opinion and the weight to be

accorded thereto. *Brannan v. Lankenau Hospital, supra,* 385 A.2d at 1383. Learned writings which are offered to prove the truth of the matters therein are hearsay and may not properly be admitted into evidence for consideration by the jury. *See: McCormick on Evidence* § 321, at 899 (3d ed. 1984).

*Id.* 370 Pa.Super. at 621, 537 A.2d at 339; *accord Kearns by Kearns v. DeHaas,* 377 Pa.Super. 200, 213, 546 A.2d 1226, 1233 (1988), *appeal den.,* 522 Pa. 584, 559 A.2d 527 (1989); Packel & Poulin, *Pennsylvania Evidence,* § 803.18 (1987). We went on to find that it was entirely appropriate for the trial court to refuse to admit the treatises. Whether offered substantively or whether read to the jury, the materials were being offered for the truth of the matter asserted, and thus were hearsay. We specifically rejected the argument that reading the documents to the jury did not create a hearsay problem. We declared: "[i]t is the purpose for which the information is offered, not the manner in which it [sic] is introduced, which makes it objectionable." *Id.* 370 Pa.Super. at 622, 537 A.2d at 340. We went on to decline to accept the plaintiff's invitation to adopt a more liberal rule towards learned treatises when relied upon by an expert.

We disagree with appellant's contention that the subject matter related to this testimony was of the type envisioned in *Commonwealth v. Thomas,* 444 Pa. 436, 445, 282 A.2d 693, 698 (1971) and *Primavera, supra.* "The kind of data contemplated by this rule is often, as it is in this case, the kind of data used daily by experts in making judgments, reaching diagnoses, and taking action." *Primavera, supra,* 415 U.S. at 49, 608 A.2d at 519–520. There has been no showing that the medical article under consideration is the type that experts use commonly as a basis for their decisions. To the contrary, the present article seems to be an unpublished paper given at a medical conference. We do not believe this type of article fits under the *Thomas* exception. The lower court did not palpably and clearly abuse its discretion in ordering a new trial on this basis.

The appellant's fourth and final argument is that the trial court erred in granting a new trial based on the court's reconsideration of its refusal to render the appellee's requested charge regarding "increased risk of harm." The appellant believes that the court's instruction adequately informed the jury that they were to find for the appellee if there "was negligence and that [appellant's] negligent conduct was a substantial factor in bringing about the harm." Thus, the appellant argues no prejudice exists because this charge conveys the tenor of the "increased risk of harm" instruction. In the alternative, the appellant claims that since the appellee's expert did not testify within a reasonable degree of medical certainty that appellant's conduct "increased the risk of harm," such an instruction was not warranted.

As we have already found sufficient reasons why a new trial is mandated, we need not address appellant's final argument. The lower court on remand, however, may wish to reconsider whether the increased risk of harm doctrine applies to this situation. *See Hamil v. Bashline*, 481 Pa. 256, 269, 392 A.2d 1280, 1286 (1978) ("Whereas typically a plaintiff alleges [in a tort action] that a defendant's act or omission set in motion a force which resulted in harm, the theory presented in [an increased risk of harm case] is that the defendant's act or omission failed in a duty to protect against harm from *another source*"). (emphasis added).

Having found that the trial court did not palpably and clearly abuse its discretion in ordering a new trial because the expert testimony exceeded the scope of the separate report and because a hearsay matter from a medical article was referred to on direct examination, we affirm the order's award of a new trial.

Order affirmed in part, reversed in part. Case remanded for proceedings consistent with this Opinion.

Jurisdiction relinquished.