J-A21006-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| GARY CHIODETTI, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| DR. EUGENE FERNANDES, | |
| Appellee | No. 63 EDA 2013 |

Appeal from the Judgment Entered November 15, 2012
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s): April Term, 2009; #0040

BEFORE:  BOWES, OTT and STRASSBURGER, *JJ.

DISSENTING MEMORANDUM BY BOWES, J.     **FILED FEBRUARY 06, 2015**

The learned Majority concedes that Dr. Iliff testified inconsistently and beyond the scope of his expert report when he "changed his opinion regarding the causation of Chiodetti's blindness."  Majority Memorandum at 10.  Yet, without even a nod to Pa.R.C.P. 4003.5(c), which precludes experts from offering opinions on direct examination that are inconsistent with or go beyond the fair scope of their reports, the Majority simply cites **Lykes v. Yates**, 77 A.3d 27, 33 (Pa.Super. 2013), for the proposition that since the jury found no negligence, "any error regarding causation would not affect the verdict."  **Id**.  It then goes on to hold that, since the jury's finding that Dr. Fernandes did not breach the standard of care was fully supportable on

*Retired Senior Judge assigned to the Superior Court.

standard of care evidence alone, the offending causation testimony could not have tainted the verdict.

I believe the trial court erred in permitting Dr. Iliff to testify inconsistently with, and beyond the scope of, the opinions contained in his expert report in violation of Pa.R.C.P. 4003.5(c). Furthermore, contrary to my distinguished colleagues, I believe the offending testimony affected both the standard of care and causation as the issues were inextricably intertwined. Since the error may have affected the verdict, I would reverse and remand for a new trial on this basis. Hence, I respectfully dissent.

Preliminarily, I believe that the proper standard of review of this issue is the one for the admissibility of evidence.

> When we review a trial court's ruling on admission of evidence, we must acknowledge that decisions on admissibility are within the sound discretion of the trial court and will not be overturned absent an abuse of discretion or misapplication of law. In addition, for a ruling on evidence to constitute reversible error, it must have been harmful or prejudicial to the complaining party.

*Gaudio v. Ford Motor Co.*, 976 A.2d 524, 535 (Pa.Super. 2009) (quoting *Stumpf v. Nye*, 950 A.2d 1032, 1036 (Pa.Super. 2008). "A party suffers prejudice when the trial court's error **could** have affected the verdict." *Trombetta v. Raymond James Financial Services, Inc.*, 907 A.2d 550, 561 (Pa.Super. 2006) (emphasis added).

Mr. Chiodetti alleges that he was ambushed by Dr. Iliff's rejection of the CRAO diagnosis contained in his report and his adoption of Dr. Duker's

OAO diagnosis. Furthermore, he contends that since the defense experts did not criticize the post-operative testing in their reports, this testimony was a surprise, and, consequently, he had no rebuttal witness available to refute it.[1] The record demonstrates the following.

Mr. Chiodetti awoke blind in his right eye after surgery performed by Dr. Fernandes to repair a fractured orbit. Mr. Chiodetti's expert, Dr. Kraushar, opined that Dr. Fernandes inadvertently injected anesthetic directly into the globe of Mr. Chiodetti's eye causing the blindness. He arrived at that conclusion after diagnosing Mr. Chiodetti as suffering from a CRAO, a condition consistent with the injection of anesthetic directly into the eye, and Dr. Fernandes' admission that he did not move the needle slightly before injecting anesthetic to ensure that it was not located in the eye itself. Dr. Kraushar testified that a physician is negligent if he fails to move the tip of the needle slightly to ensure that the globe does not move before injecting the anesthetic.

Dr. Duker, the first of two defense experts to testify, disagreed that Dr. Fernandes injected anesthetic into the eye. He arrived at that conclusion after determining that Mr. Chiodetti suffered an OAO, a condition inconsistent with such an injection. Furthermore, Dr. Duker maintained that

---

[1] Dr. Fernandes maintained that Dr. Iliff's trial opinions regarding OAO were merely "refinements" of his initial diagnosis, Appellee's brief at 19, a position rejected by the Majority as well as this author.

the injection of anesthetic into the eye was not necessarily negligent; it was a known complication of eye surgery that rarely occurred. Finally, he disputed that Dr. Kraushar's "wiggle method" was the standard of care.

Dr. Iliff, the second defense expert, had prepared an expert report in which he rendered the following opinions. The morning after surgery, it was determined that Mr. Chiodetti had "no light perception" in the surgically treated eye. Dr. Iliff stated this was "most likely due to central retinal artery occlusion (CRAO)," and that embolus was "very unlikely." Report, Nicholas Iliff, M.D., 12/29/10, at 2. He opined that the causes of Mr. Chiodetti's blindness "which should be considered" are "CRAO, trauma to the optic nerve or microvascular spasm of perineural vessels[,]" *id*., but ultimately concluded that CRAO was the most likely. He agreed that an intraocular injection of lidocaine with epinephrine into the eye could cause a CRAO, but he disputed that Dr. Fernandes' injection deviated from the standard of care, or that it perforated the eye so as to cause the CRAO. In his supplemental report, Dr. Iliff disagreed that "the standard of care requires that the needle on the syringe be moved to determine whether the eye moves with the needle." Report, Nicholas T. Iliff, M.D., 2/28/11, at 1.

Dr. Iliff's trial testimony was markedly different from his report. He characterized Dr. Kraushar's theory of the injury as "a very unlikely scenario." N.T. Trial (Jury) Vol. 4, 7/21/11, at 28. Although an OAO was not mentioned in his report as a possible cause of the blindness, he was

asked on direct examination and over objection, "What findings were there in Mr. Chiodetti's case that support the conclusion that the loss of vision was due to an obstruction of the ophthalmic artery?" *Id*. at 49. The expert then launched into a description of an OAO, how Mr. Chiodetti's symptoms were consistent with both a CRAO and an OAO, and concluded that, "there's certainly evidence here that there was a problem with the ophthalmic artery occlusion." *Id*. at 57.

Moments later, again over objection, Dr. Iliff was asked, "Now having looked at the entire set of materials again what is your opinion as to the cause of the vision loss?" *Id*. at 60. Dr. Iliff told the jury that while on his way to trial, the conclusion he reached was, "Ophthalmic artery occlusion, this is what I ultimately came to." *Id*. at 63. Counsel then exhaustively explored on direct examination why Mr. Chiodetti's findings fit the OAO scenario much better than the CRAO scenario he had originally concluded was the cause of blindness. *Id*. at 65-89. Dr. Iliff went on to criticize at length the post-operative test results that were inconsistent with an OAO. Notably, he opined that the post-operative carotid Doppler study that indicated good flow in the ophthalmic artery was inaccurate in measuring ophthalmic artery blood flow. *Id*. at 74. He testified that the tests meant nothing in this setting, that other tests were necessary to detect the blockage, and that the CT scan would not show the blood vessels. *Id*. at 78-80. Dr. Iliff, using the CT scan, demonstrated to the jury why it was

inadequate. None of this criticism was contained in his expert report; in fact, Dr. Iliff had relied on these same tests in reaching the conclusions stated in his report.

Finally, Dr. Iliff told the jury there were four potential causes of an OAO: direct trauma, swelling, irritation, and clots. *Id*. at 85-86. He explained that all of these were normal consequences of the surgery and could cause an OAO even when the surgery is performed correctly. *Id*. at 88. Dr. Iliff also reiterated Dr. Duker's testimony that an inadvertent injection of local anesthesia into the globe would not cause an OAO. *Id*. at 89.[2]

The Majority concedes that Dr. Iliff's trial testimony was inconsistent with and went far beyond the scope of his expert report. I submit that its admission was violative of Pa.R.C.P. 4003.5(c). Pa.R.C.P. 4003.5(c), often referred to as the fair scope rule, provides:

> (c) To the extent that the facts known or opinions held by an expert have been developed in discovery proceedings under subdivision (a)(1) or (2) of this rule, the direct testimony of the expert at the trial may not be inconsistent with or go beyond the fair scope of his or her testimony in the discovery proceedings as

---

[2] On cross-examination, Dr. Iliff conceded that the term "OAO" did not appear anywhere in his reports. N.T. Trial (Jury) Vol. 4, 7/21/11, at 100. He also acknowledged that he did not address therein the use of the Doppler on the carotid or ophthalmic arteries. *Id*. He admitted that he was not present in court when Dr. Duker testified, but defense counsel supplied him with a synopsis of Dr. Duker's testimony.

set forth in the deposition, answer to an interrogatory, separate report, or supplement thereto. However, the expert shall not be prevented from testifying as to facts or opinions on matters on which the expert has not been interrogated in the discovery proceedings.

The Explanatory Note to Rule 4003.5 states in pertinent part:

To prevent incomplete or "fudging" of reports which would fail to reveal fully the facts and opinions of the expert or his grounds therefor, subdivision (c) provides that an expert's direct testimony at trial may not be inconsistent with or go beyond the fair scope of his testimony as set forth in his deposition and answer to interrogatories, separate report or supplements thereto. However, he may testify to anything which he has never questioned in the discovery proceedings. This is a new provision not expressly found in the Federal Rule.

The rule is intended to avoid unfair surprise or prejudice at trial by permitting a party to prepare a meaningful response to the opponent's expert. **Jones v. Constantino**, 631 A.2d 1289, 1294-95 (Pa.Super. 1993). It "favors the liberal discovery of expert witnesses and disfavors unfair and prejudicial surprise." **Id**. (quoting **Dibel v. Vagley**, 612 A.2d 493, 499 (Pa.Super. 1992). The rule precludes experts from testifying on direct examination to opinions that are inconsistent with or beyond the scope of the opinions in their expert reports.

In **Jones**, **supra**, we affirmed the trial court's grant of a new trial based on the defense expert's testimony at trial that exceeded the scope of his expert report. The expert testified that traction, "an injury caused by the

normal manipulation of extremely fragile ducts in the course of the surgery[,]" was the cause of plaintiff's problem following gallbladder surgery. *Jones*, *supra* at 1296. However, in his expert report, the expert had opined only that the injury sustained by the plaintiff during elective gallbladder surgery was unavoidable and not caused by negligence, and he offered no alternative cause. We rejected the defense contention that the plaintiff suffered no prejudice from the expert's deviation from his report, and held that that Rule 4003.5 does not permit an expert to "make a bald assertion of non-negligence in his expert report and then proffer an in-depth theory explaining absence of culpability at trial." *Id*. We refused to sanction "ambiguity and avoidance" in expert reports, and held that reports which did not apprise the opponent of the basis for the expert's conclusion failed to comport with Pa.R.C.P. 4003.5(c).

*Walsh v. Kubiak*, 661 A.2d 416 (Pa.Super. 1995), involved claims of medical malpractice and battery for lack of informed consent against an orthopedic surgeon. The defense expert's report only discussed the lack of negligence and did not address the necessity for the surgery. The trial court precluded the expert from expressing any opinion at trial that the surgery was in fact necessary on the ground that the opinion was outside the scope of his report. On appeal, the defendant alleged this restriction constituted reversible error. We affirmed, finding nothing in the expert report that would have permitted the plaintiff to anticipate that the expert would

express the opinion that the surgery was necessary. Thus, Plaintiff could not have adequately prepared to cross-examine the expert on the subject of surgery. Furthermore, the only expert for plaintiff who could have rebutted the expert's proposed testimony had already testified and been excused. We concluded that the plaintiff would have been prejudiced by the introduction of such testimony, and that the trial court properly limited the scope of the expert's testimony to the conclusions stated in his report.

More recently, in **Woodard v. Chatterjee**, 827 A.2d 433 (Pa.Super. 2003), a motor vehicle accident case, plaintiff's expert testified based on the records of other physicians that Woodard sustained an acute cervical radiculopathy due to the accident. However, the expert's report noted only "some lingering neck pain and stiffness" from an earlier accident and made no mention of a cervical injury. **Id**. at 437. The trial court found that the expert's testimony exceeded the fair scope of his report, but found no prejudice or surprise because Ms. Chatterjee was privy to the EMG report upon which the expert relied and "had adequate time to prepare a rebuttal." **Id**. at 442. This Court reversed and awarded a new trial, concluding that not only did the testimony exceed the fair scope of the expert's report, it was prejudicial as well. We ruled that Ms. Chatterjee lacked sufficient notice that the only trial expert would testify about the findings and diagnoses of other physicians to whom he made no reference in his own reports.

In **Brodowski v. Ryave**, 885 A.2d 1045, 1065-1066 (Pa.Super. 2005) (*en banc*), this Court affirmed the trial court's refusal to admit expert testimony that was not addressed in the experts' reports on the basis of unfair surprise. We held that since the experts' reports did not address "what Dr. Byron should have known or what inquiries, if any, he should have made to the unknown person who reported to him that night[,]" expert testimony on this question was properly precluded as beyond the scope of the reports.

There is considerable precedent interpreting Rule 4003.5(c) as requiring a showing of prejudice to the opposing party in order for admission of the offending expert testimony to be considered reversible error. **See Butler v. Kiwi, S.A.**, 604 A.2d 270, 276 (Pa.Super. 1992); **Augustine v. Delgado**, 481 A.2d 319, 200-5 (Pa.Super. 1984). Where surprise results in the opposing party's inability to meaningfully cross-examine a witness or offer a rebuttal witness, we have found sufficient prejudice to warrant a new trial. Notably absent is any analysis of whether the error may have affected the verdict, which is the standard applied by the Majority herein, presumably because it is implicit that such prejudice may affect the verdict.

I believe Mr. Chiodetti has demonstrated that he was ambushed by Dr. Iliff's reversal and placed at considerable disadvantage in cross-examining the expert. Furthermore, Mr. Chiodetti was anticipating that Dr. Iliff would testify consistently with his report and favorably to Plaintiff that Mr.

Chiodetti sustained a CRAO, a condition that may result from an inadvertent injection of anesthetic into the eye. Instead, by rejecting that diagnosis and adopting Dr. Duker's OAO diagnosis, Dr. Iliff effectively ruled out an inadvertent injection of anesthetic as the cause of Mr. Chiodetti's blindness, totally undercutting Plaintiff's liability theory. Had Dr. Iliff testified consistently with his report, Mr. Chiodetti could have pointed to a defense expert who agreed with his expert's diagnosis, which was consistent with his theory of how the injury occurred. Thus, not only was Dr. Iliff's turn-about a complete surprise to Mr. Chiodetti, it also undercut Plaintiff's theory that Dr. Fernandes injected anesthetic directly into Mr. Chiodetti's eye.

Moreover, Dr. Iliff's trial testimony was unfairly prejudicial in another important respect. In his report, Dr. Iliff offered no discussion, and certainly, no criticism, of the Doppler studies and CT scan results, all of which he reviewed and relied upon in authoring his report. The results of those objective tests thoroughly undermined the OAO diagnosis as they showed normal ophthalmic artery blood flow. At trial, over objection, Dr. Iliff was permitted to testify at length that the objective tests were inaccurate and to explain why the results did not rule out OAO as the cause of Mr. Chiodetti's blindness. Since Dr. Duker's expert report also did not discuss or criticize the accuracy of the Doppler studies and CT scans that showed no interrupted blood flow in the ophthalmic artery, which seemingly refuted a diagnosis of OAO, I am persuaded by Mr. Chiodetti's contention

that this attack came as a complete surprise and that he was not prepared. Not only was his ability to cross-examine Dr. Iliff regarding the tests severely compromised, but he had no rebuttal expert in the wings who could refute the attacks on the validity of the testing. I submit that this was the type of prejudice to the opposing party that Pa.R.C.P. 4003.5(c) was intended to prevent.

The Majority agrees that Dr. Iliff's testimony on direct examination was inconsistent with and went far beyond the scope of his report, but does not address Pa.R.C.P. 4003.5, or analyze the impact of the erroneously admitted expert testimony upon the opposing party, Mr. Chiodetti. Instead, it mistakenly dismisses the offending testimony as related solely to causation, and then concludes that since the jury found no breach of the standard of care, it never reached the causation issue. I find the latter assumption untenable on the record herein.[3]

In the instant case, negligence and causation were interwoven. Mr. Chiodetti maintained that Dr. Fernandes negligently injected anesthetic directly into the globe of his eye because he failed to perform a wiggle

_____

[3] The jury responded in the negative to the first question on the verdict slip:

> "Did you find that the conduct of the defendant doctor fell below the applicable standard of care? In other words, was the defendant doctor negligent?"

maneuver prior to injecting the anesthesia to ensure that the needled was not located in the eye. A diagnosis of CRAO was consistent with the injection scenario; a diagnosis of OAO was not. Thus, Dr. Iliff's offending diagnosis testimony was highly probative of whether or not Dr. Fernandes inadvertently injected the anesthetic into Mr. Chiodetti's eye in the first instance. The expert's rejection at trial of his earlier CRAO diagnosis in favor of OAO effectively ruled out the negligent injection of anesthetic into the globe of Mr. Chiodetti's eye as the mechanism of injury. If the jury believed the defense experts that OAO rather than CRAO was the proper diagnosis, it necessarily followed that Dr. Fernandes did not negligently inject the eye with anesthetic.

I submit that the jury's verdict of no negligence is consistent with a finding either that the wiggle method was not the standard of care for the injection of anesthetic or that Dr. Fernandes did not inject anesthesia directly into Mr. Chiodetti's eye. Since Dr. Iliff's offending testimony undermined the latter, it was highly probative of negligence. Hence, I find unsupportable the Majority's conclusion that such testimony related only to causation, and that the jury did not consider it in arriving at its conclusion that Dr. Fernandes was not negligent.

Finally, I believe the Majority's analysis of the sufficiency of the standard of care evidence is misguided and irrelevant to our determination. The fact that the standard-of-care evidence alone could sustain the jury's

verdict has no bearing on whether the erroneously admitted evidence may have affected the verdict. I submit Dr. Iliff's improperly admitted testimony tended to prove that Dr. Fernandes did not inject the eye, negligently or otherwise, and thus, it may have contributed to the jury's verdict that his conduct did not fall below the standard of care. Hence, I would reverse for a new trial.