Barr v. Beck

*Charles G. Young III* and *Theodore J. Caldwell Jr.,* for plaintiff.

*Tracie Vizza* and *Paul E. Peel,* for defendants Beck and Lansdale Medical Group.

*Kenneth S. Fair,* for defendant Derby.

*James C. Sargent Jr.,* for defendants Driver and Pulmonary & Allergy Associates.

*Kathleen S. McGrath,* for defendant North Penn Hospital.

ROGERS, *J.,* February 3, 2011—

## I.  INTRODUCTION

Appellant Carolyn D. Barr, individually and as administratrix of the Estate of Darren Barr, de-

ceased ("appellant"), appeals to the Superior Court of Pennsylvania ("Superior Court") from the denial of appellant's post-trial motion for relief docketed on March 4, 2009. Pursuant to Pa.R.A.P. 1925(b), appellant submitted a concise statement of errors complained of on appeal ("concise statement"). This opinion is filed in accordance with Pa.R.A.P. 1925(a).

## II. FACTUAL AND PROCEDURAL HISTORY

This is a medical malpractice action arising from the death of Darrin Barr ("Mr. Barr" or "decedent"), a 32-year-old man, at North Penn Hospital on November 21, 1998. Mr. Barr was a patient of Lansdale Medical Group since February 1991. Between 1991 and 1998, Mr. Barr was seen by Jonathan E. Beck, D.O. ("Dr. Beck") for routine visits. On October 20, 1998, Mr. Barr was seen at Lansdale Medical Group by Linda Nadwodny, D.O. ("Dr. Nadwodny"), a partner of Dr. Beck, with complaints of rib cage pain and shortness of breath associated with use of a bench press.

On October 22, 1998, Mr. Barr was diagnosed with mild left lower lobe pneumonia and lower respiratory infection by Dr. Nadwodny. The diagnosis was based on Mr. Barr's symptoms and on a chest x-ray that showed fluid in the left lower lobe and atelactasis in the right middle lobe (N.T. November 28, 2007, pp. 82-93). Based on the symptoms and chest x-ray, Dr. Nadwodny believed the pneumonia was bacterial and not viral in origin. Dr. Nadwodny prescribed an oral antibiotic called Azithromycin, and Mr. Barrs symptoms improved (N.T. November 28, 2007, pp. 92-93). Mr. Barr was seen by Dr. Nadwodny

a second time for follow up on November 4, 1998. According to Dr. Nadwodny's November 4, 1998 office note, Mr. Barr's symptoms had resolved. A second chest x-ray was done which showed resolution of the left lower lobe infiltrate and the right lung atelactasis (N.T. November 28, 2007, pp. 93-95). On November 14, 1998, Mr. Barr's symptoms returned and he called Dr. Beck's office. A second course of Azithromycin (Zithromax) was prescribed over the phone (N.T. November 28, 2007, pp. 103-105).

On November 21, 1998, Mr. Barr reported to the emergency room at North Penn Hospital complaining of shortness of breath (N.T. December 5, 2007, p. 11 [Forstater]). Mr. Barr reported to the triage nurse that he just completed a second round of antibiotics for recurrent pneumonia. *Id.* He told the nurse that he had been treated for left lower lobe pneumonia, which had recurred on the right side approximately one week before he came to the emergency room (N.T. November 29, 2007, pp. 34-41; N.T. November 30, 2007, pp. 26-32).

Dr. Derby, the attending emergency room doctor, ordered chest x-ray, blood tests and an arterial blood gas study (N.T. December 5, 2007, pp. 12-13 [Forstater]). Dr. Derby found the tests inconclusive. At approximately 6:55 p.m., he consulted with Dr. Driver, the pulmonologist on call that evening (N.T. December 5, 2007, pp. 9-10 [Driver]). Dr. Derby called Dr. Driver and explained Mr. Barr's history noting that Mr. Barr's chest x-ray was unremarkable. He told Dr. Driver that Mr. Barr was hypoxemic (N.T. December 5, 2007, p. 10 [Driver]). Drs. Derby and Driver briefly discussed possible causes for Mr. Barr's condition, including pneumonia and pulmonary embolism

(N.T. December 5, 2007, p. 11 [Driver]). Dr. Derby told Dr. Driver that he was going to speak with Mr. Barr about leaving the hospital and receiving treatment for his shortness of breath on an out-patient basis (N.T. December 5, 2007, pp. 14-15 [Driver]). Dr. Derby also indicated that he would ask Mr. Barr if he wanted to see a pulmonary specialist before leaving the hospital (N.T. December 5, 2007, p. 14 [Driver]).

Dr. Derby paged Dr. Driver again to advise him that Mr. Barr had requested to see a pulmonary specialist (N.T. December 5, 2007, p. 18 [Driver]). Dr. Driver arrived at North Penn Hospital at approximately 8:00 p.m. (N.T. December 5, 2007, p. 19 [Driver]). Dr. Driver reviewed Mr. Barr's chart, including the lab results and chest x-ray, and then met with Mr. Barr (N.T. December 5, 2007, pp. 20-23 [Driver]). Dr. Driver examined Mr. Barr, observed Mr. Barr's demeanor, and concluded that Mr. Barr appeared comfortable; did not have difficulty speaking; and did not appear to be short of breath or cyanotic (N.T. December 5, 2007, p. 24 [Driver]). Dr. Driver observed that Mr. Barr did not show signs of impending respiratory failure despite the fact that his oxygen levels appeared to be below normal[1]. Mr. Barr had no difficulty communicating and did not appear to be in distress. Mr. Barr responded in the negative to having any chest pain (N.T. December 5, 2007, p. 27 [Driver]).

Dr. Driver concluded his examination of Mr. Barr at approximately 8:45 p.m. He found no evidence of deep

---

1. Pulse oxygenation (PO2) measures the amount of oxygen carried in the patient's blood (N.T. November 30, 2007, pp. 29-31).

vein thrombosis, no edema, and no tenderness on examination. However, upon completion of his examination of Mr. Barr, Dr. Driver suspected that Mr. Barr might have a pulmonary embolism (N.T. December 5, 2007, p. 33 [Driver]). Dr. Driver also believed that Mr. Barr could be exhibiting abnormal symptoms of pneumonia or suffering from some form of cardiac distress (N.T. December 5, 2007, pp. 34-35 [Driver]).

Dr. Driver admitted Mr. Barr to the hospital. He prescribed heparin, started a course of antibiotics, and requested a cardiology consult for Mr. Barr in the morning (N.T. December 5, 2007, p. 34 [Driver]). Dr. Driver ordered the testing to confirm or rule out the suspected pulmonary embolism (N.T. December 5, 2007, p. 36 [Driver]).

Dr. Driver ordered the "standard" dose of heparin for Mr. Barr, which was generally accepted in 1998 (N.T. December 5, 2007, p. 38 [Driver]). Dr. Driver testified that he was aware that in 1998 certain physicians were utilizing a weight-based protocol for administering heparin to patients but that he believed that the standard dose was appropriate at the time (N.T. December 5, 2007, p. 52 [Driver]). Mr. Barr was transferred from the emergency room to a patient floor of the hospital (N.T. December 5, 2007, pp. 34, 37 [Driver]). Shortly thereafter, he began seizing (N.T. December 5, 2007, pp. 40-41 [Driver]). At approximately 10:00 p.m., Dr. Driver was paged and, upon being informed of the seizure, ordered valium. Dr. Driver contacted a neurologist for consultation about Mr. Barr's condition but was interrupted by an emergency page from the hospital. Dr. Driver contacted the hospital and was informed that Mr. Barr was in cardio-respiratory arrest (N.T. December

5, 2007, pp. 41-42 [Driver]). Dr. Driver returned to the hospital to supervise the treatment of Mr. Barr until 10:56 p.m., when Mr. Barr was pronounced dead (N.T. December 5, 2007, pp. 43-45 [Driver]). The autopsy revealed a massive bilateral pulmonary embolism.

Appellant commenced a medical malpractice action by filing a writ of summons on September 7, 1999. The complaint was filed on January 24, 2000. The trial commenced on November 27, 2007 and concluded on December 10, 2007. The jury rendered a verdict in favor of all defendants.

On December 19, 2007, appellant filed her motion for post-trial relief. After consideration of appellant's motion, appellees' responses thereto, and oral argument on May 16, 2008, this court denied the post-trial motion by order dated March 2, 2009 and docketed on March 4, 2009. Appellant filed a notice of appeal on March 25, 2009. By order dated March 26, 2009, and docketed on March 27, 2009, the undersigned directed appellant to file a concise statement with the court, pursuant to Pa. R.A.P. 1925 (b) (1). Appellant's concise statement was timely filed on April 13, 2009.

### III. ISSUES

Appellant raises the following allegations of error on the part of the court:

1.   Plaintiff contends this court erred in instructing the jury on the so-called "two schools of thought" doctrine with respect to the closing of heparin ordered by defendant, Albert Driver, M.D. The "two schools" instruction

was inapplicable to the circumstances presented by the evidence in this case, since the experts all agreed that heparin was the appropriate treatment, but disagreed as to the proper doses of heparin to utilize.

Plaintiff further contends that this court erred by giving this instruction since defendants failed to meet their burden of establishing the existence of two schools of thought on this issue. Defendants failed to meet their burden of proof to establish that a "considerable number of recognized and respected professionals" followed each of the claimed two competing schools of thought, as required by Pennsylvania Supreme Court precedent. At most, the testimony presented by defendants established only that "some" or "one group of" physicians used the alleged alternative school of thought in 1998. The expert testimony actually demonstrated only conflicting opinions as to the standard of care applicable to heparin dosing in 1998, not the existence of two competing schools of thought on heparin dosing. Furthermore, while the two schools of thought doctrine is intended to protect a physicians' (sic) exercise of judgment, Dr. Driver exercised no "judgment" in choosing his heparin dose, as he testified he was unaware of the weight based protocol adopted by North Penn Hospital, and was merely following the practice he was taught in his residency, over 15 years before the treatment of Mr. Barr.

The two schools of thought doctrine was not applicable to the circumstances of this case. Defendants did not meet their burden of establishing the existence of

two schools of thought with respect to the treatment of plaintiff's decedent. The instruction should not have been given. A reversal of the verdict in favor of defendant Driver and North Penn Hospital is required as a matter of law.

2. Plaintiff contends this court erred in limiting plaintiff's counsel in the use of medical literature in the cross-examination of defendant's medical expert witnesses. The court improperly limited plaintiff's counsel by applying the limitations for the use of medical literature on direct examination set down by the Supreme Court in *Aldridge*. Moreover, the court improperly limited plaintiff's counsel in the use of medical literature recognized by one of the defense experts as authoritative. The court limited the use of this treatise with another defense expert and with Dr. Driver. Finally, the court erred in limiting the cross examination of Dr. Driver with various articles from the medical literature, particularly in the face of his claims at trial that he relied on both an out-dated textbook and studies, recently published at the time, in treating plaintiff's decedent.

Both the substantive and impeachment purposes for which plaintiff sought to utilize the medical literature were appropriate on cross examination, were not prohibited by the Supreme Court's opinion in *Aldridge*, and should have been permitted by this court. The court's rulings precluded plaintiff's counsel from demonstrating that defendant and the defense experts were relying on an outdated standard of care, and limited plaintiff's ability to challenge the testimony of the experts and,

particularly, Dr. Driver. These limitations caused severe prejudice to plaintiff.

3. Plaintiff contends that the trial court erred in permitting counsel for defendant, North Penn Hospital, to read certain excerpts of the deposition testimony of David Krampaski (sic), R.Ph, over the objection of plaintiff. Specifically, defendant was permitted to read portions of the testimony of Mr. Krampaski (sic) in which he purported to describe the heparin dosing practices of unnamed physicians at North Penn Hospital during the relevant time period. The permitted testimony of Mr. Krampaski (sic) was in effect an opinion concerning the standard of care applicable to defendant Driver, an opinion for which Mr. Krampaski (sic) did not have sufficient qualifications to express at trial. Moreover, Mr. Krampaski's (sic) testimony dealt solely with the conduct of physicians at North Penn Hospital and was not relevant to the applicable standard of care. By permitting his testimony in this regard, the court allowed defendants to improperly suggest to the jury that the heparin dosing schedule followed by Dr. Driver comported with the applicable standard of care, resulting in severe prejudice to plaintiff.

4. Plaintiff contends that the trial court erred in prohibiting counsel for plaintiff from introducing into evidence and cross-examining defendant, Jonathan Beck, D.O., concerning his failure to meet the continuing legal education requirements of his specialty in the two years immediately preceding his care and treatment of plaintiff's decedent. Plaintiff should have been permit-

ted to demonstrate to the jury that at the time Dr. Beck treated plaintiff's decedent, he had failed to complete the required number of CLE hours and therefore did not meet the appropriate qualifications for his medical license. Moreover, Dr. Beck's false certification of the completion of the requisite CLE requirements was relevant and admissible to impeach his credibility. Because of the lack of records pertaining to Dr. Beck's encounters with plaintiff's decedent, his credibility was central to plaintiff's claims against him.

5. Plaintiff's objections and arguments with regard to each of the issues set forth in this statement were properly preserved for appeal by way of pre-trial motion or objection made at trial. Plaintiff's arguments are set forth more fully in her post-trial motions and brief.

## IV. DISCUSSION

"[A]bsent a clear abuse of discretion by the trial court, appellate courts must not interfere with the trial court's authority to grant or deny a new trial." *Harman ex rel. Harman v. Borah*, 562 Pa. 455, 466, 756 A.2d 1116, 1122 (2000). In *Harman*, the Supreme Court of Pennsylvania re-examined the appropriate standard of review of a motion for a new trial at both the trial court and appellate levels. The court noted that the trial court must follow a two-step process in responding to a request for a new trial. The trial court must first determine whether a factual, legal or discretionary mistake was made at trial. 562 Pa. at 467, 756 A.2d at 1122. If the trial court determines that one or more mistakes were made, it must then evaluate whether the mistake provided a sufficient basis for grant-

ing a new trial. *Id.* Moreover, the court noted that "[a] new trial is not warranted merely because some irregularity occurred during the trial or another trial judge would have ruled differently; the moving party must demonstrate to the trial court that he or she has suffered prejudice from the mistake." *Id.* (citations omitted)

The standard of review when considering the adequacy of jury instructions in a civil case is to "determine whether the trial court committed clear abuse of discretion or error of law controlling the outcome of the case." *Stewart v. Motts,* 539 Pa. 596, 606, 654 A.2d 535, 540 (1995). "It is only when the charge as a whole is inadequate or not clear or has a tendency to mislead or confuse rather than clarify a material issue that error in a charge will be found to be a sufficient basis for the award of a new trial." *Id. Ferrer v. Trustees of university of Pennsylvania,* 573 Pa. 310, 345, 825 A.2d 591, 612 (2002); see also *Tindall v. Friedman,* 970 A.2d 1159, 1175 (Pa. Super. 2009).

*Two Schools of Thought*

In this matter, appellant contends the court erred in giving the "two schools of thought" instruction to the jury as it was inapplicable to the circumstances presented by the evidence in the case. We disagree.

On the contrary, the court did not instruct the jury that two "schools of thought" actually existed in 1998. It merely alerted the jury to that possibility and allowed the jury to make the finding. The "two schools of thought" doctrine has long been recognized in Pennsylvania courts as a relevant and appropriate instruction, which may be given in a medical malpractice case where there is more

than one method of accepted treatment. *Furey v. Thomas Jefferson University Hospital,* 472 A. 2d 1083, 1089 (Pa. Super. 1984). In circumstances where the prescribed medical treatment or procedure has been approved by one group of medical experts even though an alternate group recommends another approach, the doctrine is oftentimes applied. Likewise, where experts agree that alternative treatments or procedures are acceptable, the "two schools of thought" doctrine provides a complete defense to a malpractice claim. *Levine v. Rosen,* 532 Pa. 512, 519, 616 A. 2d 623, 627 (Pa. 1992); *Jones v. Chidester,* 531 Pa. 31, 39, 610 A.2d 964, 969 (Pa. 1992). "Where competent medical authority is divided, a physician will not be held responsible if, in the exercise of his judgment, he followed a course of treatment advocated by a considerable number of his professional brethren in good standing in his community." *Duckworth et al. v. Bennett,* 320 Pa. 47, 51, 181 A. 558, 559 (1935). This doctrine was created to allow juries in medical malpractice cases to recognize that a physician may choose a particular method of treatment, without liability, so long as that method is recognized among a considerable number of physicians in his community. The doctrine also was created so that "[a] jury may not decide which of two respected methods of treatment is the better one." *Furey,* 472 A.2d at 1090.

Appellant further contends that the foundational requirement for a "two schools of thought" instruction has not been met. A defendant bears the burden of proving that such instruction is appropriate. However, the Supreme Court specifically has held that this burden "should not prove burdensome." *Jones v. Chidester,* 531 Pa. 31, 40,

610 A.2d 964, 969 (1992). Rather, as that court noted, "[t]he proper use of expert witnesses should supply the answers. Once the expert states the factual reasons to support his claim that there is a considerable number of professionals who agree with the treatment employed by the defendant, there is sufficient evidence to warrant an instruction to the jury on the "two schools of thought.'" *Id.* At that point, the question becomes one for the jury who must decide, "whether they believe that there are two legitimate schools of thought such that the defendant should be insulated from liability." *Id.* at 40-41, 610 A.2d at 969.

In the case sub judice, Dr. Driver followed the framework articulated by the Supreme Court when both he and his expert testified that Dr. Driver's dosing method was the standard utilized in the management of heparin by a considerable number of recognized and respected practitioners at the relevant period of time. Dr. Marik, Dr. Driver's expert, testified that either protocol was within the standard of care, and that Dr. Driver's choice of the standard dosing even while weight-based protocol was an "evolving" practice, fell squarely within the standard of care (N.T. December 6, 2007, pp. 21-23 [Marik]). Dr. Forstater, an expert on behalf of North Penn Hospital, explained that the standard dosage protocol was "used at Thomas Jefferson Hospital" and described it as being the "standard across the nation" (N.T. December 5, 2007, p. 19 [Forstater]).

Dr. Driver satisfied his burden of proving the prerequisite to a "two schools of thought" instruction. See, *Duckworth*, supra. The undersigned's decision to allow the jury to decide whether there were, in fact, two schools of

thought, was entirely appropriate. Thus, appellant's contention lacks merit.

Appellant's assertion that the jury instruction was inappropriate because Dr. Driver did not satisfy his purported burden of presenting testimony acknowledging that there was another school of thought or testimony which established that the method he chose was one of the two "alternative" treatments is unsupported by the applicable law as well as the facts of this case. The well-established case law clearly and unequivocally obligates a physician only to present evidence that his or her method is "advocated by a considerable number of recognized and respected professionals ..." See *Jones*, supra, 531 Pa. at 40, 610 A.2d at 969 (1992). There is no requirement that the defendant physician acknowledge the existence of other accepted methods. However, even if that were the requirement, Dr. Driver produced sufficient evidence to satisfy it. At trial, both Drs. Driver and Marick acknowledged that there was another protocol, namely a weight-based protocol that other physicians were using for heparin dosing in 1998.

Appellant contends that Dr. Driver failed to lay the necessary foundation because he failed to identify the requisite number of physicians following this protocol. We disagree. The Pennsylvania Supreme Court specifically has refused to quantify the number of professionals who must accept the method. *Jones*, 531 Pa. at 40, 610 A.2d at 969 ("we do not attempt to place a numerical certainty on what constitutes a 'considerable number'"). Instead, the court has advocated a more flexible approach and has held that an expert witness who provides factual reasons to support his claim that there is a considerable number of profession-

als who agree with the treatment employed by a defendant physician "suppl[ies] the answers" and, hence the necessary foundation for the instruction on the "two schools of thought." *Id.* The "answer" clearly was "supplied" in this case by the testimony of Drs. Marik, Forstater, and Driver, all of whom testified as to the number of physicians who, in 1998, followed the standard dosing protocol both locally and throughout the nation. Thus, any claim that Dr. Driver failed to carry his burden of proving that a "considerable" number of physicians subscribed to this school of thought is without merit.

Finally, appellant contends that this was not a "two schools of thought" case but rather one where the jury should have determined from the expert testimony what the standard of care in 1998 actually was. We disagree.

The "two schools of thought" doctrine was created specifically and precisely to avoid having a jury unfamiliar with medicine and clearly without expertise in the relevant fields from having to choose between two separate schools of thought to decide an appropriate standard of care. Thus, appellant's contention that the jury should have been permitted to define the standard of care (and then permitted to determine if Dr. Driver breached it) is inconsistent with the body of case law developed on this issue and, in any event, would place jurors in the position of opining on medical issues. Dr. Driver complied with his obligations and laid the appropriate groundwork for this instruction.

*Learned Treatise*

Appellant next contends that she is entitled to a new

trial because the undersigned limited appellant's counsel's use of medical literature in the questioning of Dr. Driver and his experts regarding the specific substance of texts recognized as authoritative and/or relied on by the witnesses.

While appellant alleges that she was precluded from or limited in the cross-examination of Dr. Driver and his experts, appellant specifically challenged only Dr. Driver himself. Therefore, the only issue, which has been preserved in the concise statement, deals with Dr. Driver.

It is well settled that the admissibility of evidence rests largely within the sound discretion of the trial court. *Leonard v. Nichols Homeshield, Inc.,* 557 A.2d 743 (Pa. Super. 1989), petition for allowance of appeal denied, 525 Pa. 584, 575 A. 2d 115 (1990). An appellate court will only reverse the trial court's admission of such evidence upon a clear showing of an abuse of discretion. *Id.*

The controlling cases on the issue of appropriate use of learned treatises and the interplay of the hearsay doctrine are the Supreme Court's decision in *Aldridge v. Edmunds,* 561 Pa. 323, 750 A.2d 292 (2000), and the Superior Court's decision in *Jones v. Constantino,* 631 A.2d 1289 (Pa. Super. 1993). In *Aldridge,* the court set forth the specific parameters of the law with regard to use of learned treatises in the context of direct examination. Significantly, the court noted that, "When offered at a trial to establish principles or theories from their contents, texts and periodicals fall within the traditional definition of hearsay - an extrajudicial declaration offered to prove the truth of the matter asserted." 561 Pa. at 331, 750 A. 2d

at 296, quoting *Majdic v. Cincinnati Machine Co.*, 537 A.2d 334, 338-339 (Pa. Super. 1988) (en banc). Moreover, the court noted that evidentiary rules restricting the presentation of hearsay statements precluded parties from employing treatise materials as substantive proof of their contents. *Id.* (citations omitted)

*Jones*, on the other hand, summarized the law in this commonwealth with regard to the ability to cross-examine an expert witness on the contents of a publication upon which he or she has relied in forming an opinion, and with respect to "any other publication which the expert acknowledged to be a standard work in the field." 631 A.2d at 1297.

In the context of cross-examination, the Superior Court in *Jones* held that the publication or literature may not be admitted for the truth of the matter asserted, but only to challenge the credibility of the witness' opinion in circumstances where the expert has relied on the treatise and/ or has recognized it as authoritative. *Id.* (citing *Brannan v. Lankenau Hospital*, 385 A.2d 1376, 1383 (Pa. Super. 1978)) ("learned writings which are offered to prove the truth of the matters therein are hearsay and may not properly be admitted into evidence for consideration by the jury"). McCormick on Evidence § 321, at 899 (3d ed. 1984).

In *Jones*, the Superior Court held that the trial court properly precluded a party from reading the text of learned treatises to the jury in the context of cross-examination because, according to the court, "Whether offered substantively or whether read to the jury, the materials were

being offered for the truth of the matter asserted, and thus were hearsay." 631 A.2d at 1297. Thus, the court specifically noted that: "[i]t is the purpose for which the information is offered, not the manner in which it is introduced, which makes it objectionable." 631 A.2d at 1298; see also, *Majdic v. Cincinnati Machine Co.*, 622, 537 A. 2d 334, 340 (Pa. Super. 1998) ("excerpts from a publication which are read into evidence for the purpose of proving the truth of the statements contained therein are still hearsay and, therefore, inadmissible. This fact is not changed merely because the document is read into evidence by the witness instead of being received as an exhibit for inspection by the jury").

In the instant matter, appellant's counsel admits that he intended to read or present specific passages from these treatises to the jury during Dr. Driver's cross-examination. The purpose of the recitation or reading, appellant contends, was to impeach him with the substance of more recent literature in which a different standard of care was articulated. Appellant also admits that this information had a "substantive purpose" which was to establish Dr. Driver's negligence in not keeping abreast of recent developments in medicine as required by the standard of care. Ostensibly, appellant hoped to present this information for the truth of the matter asserted, i.e., to establish the existence of a different standard of care.

The treatises, which appellant attempted to read aloud, clearly constitute hearsay, and were inadmissible. Moreover, there is no exception to the hearsay doctrine applicable here. First, Dr. Driver was a fact witness, not an expert. The cases allowing an expert to be impeached by treatises

upon which he relied are inapposite. Second, even if Dr. Driver were an expert, he never testified that he had relied on the later versions of the treatises to which he referred and/or that the later versions were authoritative. Appellant attempted to impeach him with materials he had never read or relied upon.

Consequently, appellant sustained no prejudice as a result of the undersigned's rulings. Appellant was permitted to inquire whether Dr. Driver read the passage from the treatises to himself, and to inquire whether Dr. Driver agreed with the passages. Appellant was also able to establish that Dr. Driver was not familiar with the treatises. Moreover, the jury heard the precise contents and substance of these treatises during the direct examination of appellant's experts. Appellant's recitation of these passages to the jury during Dr. Driver's cross-examination would have been redundant and cumulative.

The undersigned found no merit to appellant's contention that this court erred in limiting appellant's counsel in the use of medical literature in the cross-examination of appellee's medical expert witness.

*David Krempasky, R. Ph.*

Appellant contends that the trial court erred in permitting counsel for appellee, North Penn Hospital ("North Penn Hospital"), to read certain excerpts of the deposition testimony of David Krempasky, over the objection of appellant. Specifically, North Penn Hospital was permitted to read portions of the testimony of David Krempasky in which he purported to describe the heparin dosing practices of unnamed physicians at North Penn Hospital during

the relevant time period. We disagree.

"The admission or exclusion of evidence, including the admission of testimony from an expert witness, is within the sound discretion of the trial court." *McClain ex rel. Thomas v. Welker*, 761 A.2d 155, 156 (Pa. Super. 2000) appeal denied, 565 Pa. 647, 771 A.2d 1286 (2001) (quoting *Turney Media Fuel, Inc. v. Toll Bros., Inc.*, 725 A.2d 836, 839 (Pa.Super. 1999)), "[I]t is well established in this commonwealth that the standard for qualification of an expert witness is a liberal one." *McClain*, supra at 156 (quoting *Miller v. Brass Rail Tavern*, 541 Pa. 474, 480, 664 A.2d 525, 528 (1995)). "In general, to qualify as an expert witness, one must only 'possess more expertise than is within the ordinary range of training, knowledge, intelligence, or experience.'" *Freed v. Geisinger Medical Center*, 910 A.2d 68, 73 (Pa. Super. 2006). Expert testimony in medical malpractice matters are governed by section 512 of the Medical Care Availability and Reduction of Error Act, (MCARE)[2], 40 P.S. §1303.512. To be qualified to render

---

2. Medical Professional Liability
§1303.512. Expert qualifications
(a)   General rule. -- No person shall be competent to offer an expert medical opinion in a medical professional liability action against a physician unless that person possesses sufficient education, training, knowledge and experience to provide credible, competent testimony and fulfills the additional qualifications set forth in this section as applicable.
(b)   Medical testimony. -- An expert testifying on a medical matter, including the standard of care, risks and alternatives, causation and the nature and extent of the injury, must meet the following qualifications:
(1)   Possess an unrestricted physician's license to practice medicine in any state or the District of Columbia.
(2)   Be engaged in or retired within the previous five years from active clinical practice or teaching.
Provided, however, the court may waive the requirements of this subsection for an expert on a matter other than the standard of care if the court determines that the expert is otherwise competent to testify about medical or scientific issues by virtue of education, training or experi-

an opinion as to the standard of care under section 512 of the MCARE Act, an expert witness must be engaged in or retired from active clinical practice or teaching within the previous five years, calculated from the time of the defendant physician's alleged deviation from the standard of care. 40 P.S. §1303.512(b)(2).

In this matter, appellant read into evidence deposition testimony given by David Krempasky, North Penn Hospital's Director of Pharmacy, to describe the hospital's written protocol regarding the weight-based method of determining heparin dosage (N.T. November 30, 2007, pp. 3-17). Appellees subsequently read into evidence additional testimony by David Krempasky also involving

---

ence.

    (c) Standard of care. -- In addition to the requirements set forth in subsections (a) and (b), an expert testifying as to a physician's standard of care also must meet the following qualifications:

    (1) Be substantially familiar with the applicable standard of care for the specific care at issue as of the time of the alleged breach of the standard of care.

    (2) Practice in the same subspecialty as the defendant physician or in a subspecialty, which has a substantially similar standard of care for the specific care at issue, except as provided in subsection (d) or (e).

    (3) In the event the defendant physician is certified by an approved board, be board certified by the same or a similar approved board, except as provided in subsection (e).

    (d) Care outside specialty. -- A court may waive the same subspecialty requirement for an expert testifying on the standard of care for the diagnosis or treatment of a condition if the court determines that:

    (1) the expert is trained in the diagnosis or treatment of the condition, as applicable; and

    (2) the defendant physician provided care for that condition and such care was not within the physician's specialty or competence.

    (e) Otherwise adequate training, experience and knowledge. -- A court may waive the same specialty and board certification requirements for an expert testifying as to a standard of care if the court determines that the expert possesses sufficient training, experience and knowledge to provide the testimony as a result of active involvement in or full-time teaching of medicine in the applicable subspecialty or a related field of medicine within the previous five-year time period.

hospital protocol not to address the standard of care.

David Krempasky is a registered pharmacist. He testified that North Penn Hospital pharmacists "control distribution and dispensing of medicine in a safe manner..." (N.T. November 30, 2007, pp. 3-4). David Krempasky was a member of the interdisciplinary team that wrote the protocol in question, and was a member of the North Penn Hospital pharmacy committee "where all of these types of protocols involving drugs are approved with input from physicians and nurses..." (N.T. November 30, 2007, pp. 6-7). The portions of David Krempasky's testimony that was read into the record by appellant covered a wide range of matters regarding the protocol including why and how the protocol was developed and drafted; when and how the protocol was effected; what the protocol required in terms of calculating a heparin dosage using a weight based approach; what a doctor's responsibilities were under the protocol; and whether a doctor could make changes to the protocol (N.T. November 30, 2007, pp. 6-17). Additionally, appellant read into the record the following exchange:

> According to this chart [in the protocol], if somebody was in need of Heparin, and they were in excess of 220 pounds, what would the initial bolus dose [of Heparin] be? You can look at the chart?
>
> It's probably about 8,000, 7,000 for an initial bolus, based on weight.
>
> Is that a suggested - -
>
> There are other ways to do it. (*Id.*, pp. 13-14).

Portions of the deposition testimony that appellant introduced initially raised the issue whether there was more than one way to dose Heparin despite the protocol calling for a weight-based dosing. David Krempasky clarified that doctors at North Penn Hospital used both the standard method and the protocol's weight-based approach to administer Heparin during the time at issue in this matter. The court's decision to permit counsel for North Penn Hospital to read certain excerpts of the deposition testimony of David Krempasky, R. Ph. over the objection of appellant was proper.

*Jonathan Beck, D.O.*

Appellant contends that the trial court erred in prohibiting appellant's counsel from introducing into evidence and cross-examining Dr. Beck concerning the civil penalty imposed on Dr. Beck by the Pennsylvania Bureau of Occupations and Professions.

The penalty was imposed on Dr. Beck for his failure to timely meet the Continuing Medical Education (CME) requirements of his specialty in the two years immediately preceding his care and treatment of appellant's decedent. Moreover, appellant contends that this evidence was directly relevant to Dr. Beck's possession of the skill and knowledge required by the standard of care, to his qualifications to practice medicine at the time he treated Mr. Barr, as well as to Dr. Beck's credibility. For the following reasons, we find that appellant's contentions are without merit.

The basic requisite for the admission of any evidence is that it be both competent and relevant. Evidence is "com-

petent" if it is material to the issues to be determined at trial, and "relevant" if it tends to prove or disprove a material fact in issue. "The question of whether evidence is relevant and, therefore, admissible, is a determination that rests within the sound discretion of the trial court and will not be reversed on appeal absent a showing that the court clearly abused its discretion...It is the court's function to exclude any evidence, which would divert attention from the primary issues in the case, thus, the trial judge has broad discretion regarding the admissibility of potentially misleading or confusing evidence." *Turney Media Fuel v. Toll Bros., Inc.* 725 A.2d 836, 839 (Pa. Super. 1999) (citations omitted).

In this matter, the trial court properly excluded evidence of Dr. Beck's representation to the Pennsylvania Board of Osteopathy that in applying for renewal of his license in 1998, he had met the board's requirements for continuing medical education credits since there was no correlation to any quality of care issues. Moreover, appellant failed to show that whatever failure there might have been on the part of Dr. Beck to comply with any technical medical licensing requirements, there was no corresponding failure bearing on his competency as a medical practitioner in the matter at hand.

Moreover, appellant has not offered any evidence that Dr. Beck was ever convicted of a crime in connection with his failure to timely complete his CME credits. Appellant argues that Dr. Beck signed a consent decree wherein he admitted that upon applying for renewal of his license to the board of osteopathy in 1998, he misrepresented that he had completed his CME credits. Mainly, this argument

constitutes evidence of a specific act, which did not result in a conviction. Therefore, as Pennsylvania law does not permit parties to impeach witnesses through evidence of specific instances of conduct that have not resulted in a conviction, appellant cannot use this evidence to impeach Dr. Beck. It is well-settled in Pennsylvania "that a witness may not be contradicted on matters not germane to the issue involved." *Hammel v. Christian*, 610 A. 2d 979, 984 (Pa. Super. 1992), allocatur denied, 533 Pa. 652, 624 A.2d 111 (1993).

Even if such evidence of Dr. Beck's failure to timely complete his CME credits in 1998 could conceivably have had any minor relevance, its probative value is outweighed by the danger of causing unfair prejudice or confusion and a tendency to suggest a decision on an improper basis. Moreover, "[t]o constitute reversible error, a ruling on evidence must be shown not only to have been erroneous but harmful to the party complaining." *Hart v. W.H.Stewart, Inc.*, 523 Pa. 13, 16, 564 A.2d 1250, 1252 (1989). Here, however, appellant fails to properly establish that this court's preclusion order caused appellant any prejudice in any way. Rather, appellant suggests that the court's ruling prejudiced her case because it hampered her ability to convince the jury that Dr. Beck failed to properly use the differential diagnosis method of treatment on Mr. Barr and because it hindered her ability to attack Dr. Beck's credibility. Appellant failed further to clarify how evidence that Dr. Beck's failure to timely complete his CME credits in 1998 tended to prove that Dr. Beck failed to use the differential diagnosis method of treatment on Mr. Barr. In fact, appellant's internal medicine expert, Paul Gene-

cin, M.D., testified that every physician throughout the country is taught the differential diagnosis method by the second year of medical school (N.T. November 28, 2007, pp. 66-74).

Therefore, appellant cannot contend that the precluded evidence would have shown that Dr. Beck was unfamiliar with this method of medical treatment. Moreover, Dr. Genecin provided more than sufficient testimony to support appellant's claim that Dr. Beck breached the standard of care by failing to properly utilize the differential diagnosis method of treatment on Mr. Barr (N.T. November 28, 2007, pp. 39-113). Hence, this court's preclusion of this evidence was proper.

*Arguments Set Forth in Post-trial Motions and Brief*

Appellant contends that the objections and arguments with regard to each of the issues set forth in this concise statement were properly preserved for appeal by way of pre-trial motion or objection made at trial. Appellant further contends that her arguments are set forth more fully in her post-trial motions and brief. To the extent that these objections and arguments are set forth concisely and identify each alleged ruling of error in the concise statement, the trial court has addressed same in this opinion. However, issues not included in the concise statement and/or not raised in accordance with the provisions Pa.R.A.P. 1925(b) (4) (ii)[3] are waived.

---

3. Rule 1925. Opinion in Support of Order
    (a)   Opinion in support of order.
    (1)   General rule. -- Except as otherwise prescribed by this rule, upon receipt of the notice of appeal, the judge who entered the order giving rise to the notice of appeal, if the reasons for the order do not already

appear of record, shall forthwith file of record at least a brief opinion of the reasons for the order, or for the rulings or other errors complained of, or shall specify in writing the place in the record where such reasons may be found.

If the case appealed involves a ruling issued by a judge who was not the judge entering the order giving rise to the notice of appeal, the judge entering the order giving rise to the notice of appeal may request that the judge who made the earlier ruling provide an opinion to be filed in accordance with the standards above to explain the reasons for that ruling.

(2) Children's fast track appeals. -- In a children's fast track appeal:

(i) The concise statement of errors complained of on appeal shall be filed and served with the notice of appeal required by Rule 905. See Pa. R.A.P. 905(a)(2).

(ii) Upon receipt of the notice of appeal and the concise statement of errors complained of on appeal required by Rule 905(a)(2), the judge who entered the order giving rise to the notice of appeal, if the reasons for the order do no already appear of record, shall within 30 days file of record at least a brief opinion of the reasons for the order, or for the rulings or other errors complained of, which may, but need not, refer to the transcript of the proceedings.

(b) Direction to file statement of errors complained of on appeal; instructions to the appellant and the trial court. -- If the judge entering the order giving rise to the notice of appeal ("judge") desires clarification of the errors complained of on appeal, the judge may enter an order directing the appellant to file of record in the trial court and serve on the judge a concise statement of the errors complained of on appeal ("Statement").

(1) Filing and service. -- Appellant shall file of record the Statement and concurrently shall serve the judge. Filing of record and service on the judge shall be in person or by mail as provided in Pa.R.A.P. 121(a) and shall be complete on mailing if appellant obtains a United States Postal Service Form 3817, Certificate of Mailing, or other similar United States Postal Service form from which the date of deposit can be verified, in compliance with the requirements set forth in Pa.R.A.P. 1112(c). Service on parties shall be concurrent with filing and shall be by any means of service specified under Pa.R.A.P. 121(c).

(2) Time for filing and service. -- The judge shall allow the appellant at least 21 days from the date of the order's entry on the docket for the filing and service of the Statement. Upon application of the appellant and for good cause shown, the judge may enlarge the time period initially specified or permit an amended or supplemental Statement to be filed. In extraordinary circumstances, the judge may allow for the filing of a Statement or amended or supplemental Statement nunc pro tunc.

(3) Contents of order. -- The judge's order directing the filing and service of a Statement shall specify:

(i) the number of days after the date of entry of the judge's order within which the appellant must file and serve the Statement;

# V. CONCLUSION

For the foregoing reasons, the undersigned respectfully requests that the court's denial of appellant's motion for post-trial relief be affirmed.

---

(ii)   that the Statement shall be filed of record;

(iii)  that the Statement shall be served on the judge pursuant to paragraph (b)(1);

sufficient detail to identify all pertinent issues for the judge. The judge shall not require the citation to authorities; however, appellant may choose to include pertinent authorities in the Statement.

(iii)  The judge shall not require appellant or appellee to file a brief, memorandum of law, or response as part of or in conjunction with the Statement.

(iv)  The Statement should not be redundant or provide lengthy explanations as to any error. Where non-redundant, non-frivolous issues are set in an appropriately concise matter, the number of errors raised will not alone be grounds for finding waiver.

(v)   Each error identified in the Statement will be deemed to include every subsidiary issue contained therein which was raised in the trial court; this provision does not in any way limit the obligation of a criminal appellant to delineate clearly the scope of claimed constitutional errors on appeal.

(vi)  If the appellant in a civil case cannot readily discern the basis for the judge's decision, the appellant shall preface the Statement with an explanation as to why the Statement has identified the errors in only general terms. In such a case, the generality of the Statement will not be grounds for finding waiver.

(vii) Issues not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived.

(iv)  that any issue not properly included in the Statement timely filed and served pursuant to subdivision

(b)   shall be deemed waived.

(4)   Requirements; waiver.

(i) The Statement shall set forth only those rulings or errors that the appellant intends to challenge.

(ii)  The Statement shall concisely identify each ruling or error that the appellant intends to challenge with Judicial Secretary.